**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK
BROOKLYN DIVISION**

|  |  |
|---|---|
| REPLY ALL CORP.,<br><br>　　　　Plaintiff,<br><br>v.<br><br>GIMLET MEDIA, INC.<br><br>　　　　Defendant. | Civil Action No. 1:15-CV-04950-WFK-PK<br><br>**PUBLIC VERSION**<br><br><br>**SERVED ON DECEMBER 1, 2017** |

**DEFENDANT GIMLET MEDIA, INC.'S COMBINED
MEMORANDUM OF LAW IN SUPPORT OF ITS MOTIONS FOR
<u>SUMMARY JUDGMENT OF NO INFRINGEMENT LIABILITY AND NO DAMAGES</u>**

John L. Welch
Stephanie G. Stella
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Avenue
Boston, MA 02210
Telephone: (617)-646-8000
john.welch@wolfgreenfield.com
stephanie.stella@wolfgreenfield.com

Scott I. Forman
WOLF, GREENFIELD & SACKS, P.C
405 Lexington Avenue
New York, NY 10174
Telephone: (617)-646-8000
scott.forman@wolfgreenfield.com

## TABLE OF CONTENTS

I.     INTRODUCTION ..................................................................................................... 1

II.    BACKGROUND ...................................................................................................... 3

       A.   Defendant Gimlet Media, Inc. ..................................................................... 3

       B.   Plaintiff Reply All Corp. ............................................................................. 6

       C.   The Parties' Dispute ..................................................................................... 9

            1.   The December 2, 2014 Audio-Recorded Negotiations ........................ 9

            2.   The Parties December 2–18, 2014 Email Negotiations ...................... 11

       D.   The Failed Settlement Negotiations and Their Aftermath .......................... 11

III.   LEGAL STANDARD FOR SUMMARY JUDGMENT .................................... 12

IV.    ARGUMENT ......................................................................................................... 13

       A.   Gimlet Media Is Entitled to Summary Judgment That There Is No Likelihood
            of Confusion. ............................................................................................... 13

            1.   Applying The *Polaroid* Factors ...................................................... 16

                 a)   Plaintiff's Mark Is Weak In Gimlet Media's Podcast Market. ...................19

                 b)   Gimlet Media's Mark Is Materially Different From Plaintiff's Mark.........23

                 c)   The Parties' Products Are Not In Competitive Proximity. .........................25

                 d)   Gimlet Media Adopted Its Mark In Good Faith.........................................28

                 e)   There Is No Evidence of Plaintiff's Bridging of the Gap. ..........................30

                 f)   Plaintiff's Purported Evidence of Actual Confusion Is Not
                      Consumer Confusion.................................................................................31

                 g)   Both Plaintiff and Gimlet Media Market to Sophisticated
                      Consumers.................................................................................................34

                 h)   Plaintiff Agrees That Gimlet Media Produces High Quality
                      Podcasts.....................................................................................................36

       B.   Gimlet Media Is Entitled to Summary Judgment That Neither Damages Nor
            Injunctive Relief Is Available to Plaintiff. ................................................ 37

            1.   Plaintiff Is Not Entitled To Gimlet Media's Profits............................ 39

            2.   Plaintiff Is Not Entitled To A Reasonable Royalty. ........................... 39

            3.   Plaintiff Is Not Entitled To Injunctive Relief. ................................... 40

V.     CONCLUSION ...................................................................................................... 40

## TABLE OF AUTHORITIES

**CASES**

*Amstar Corp. v. Domino's Pizza, Inc.,*
  615 F.2d 252 (5th Cir. 1980) ................................................. 36

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986) ........................................................... 13

*Anti-Monopoly, Inc. v. Gen. Mills Fun Grp.,*
  611 F.2d 296 (9th Cir. 1979) ................................................. 16

*Arrow Fastener Co. v. Stanley Works,*
  59 F.3d 384 (2d Cir. 1995) .......................................... 25, 29, 36

*Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.,*
  973 F.2d 1033 (2d Cir. 1992) ................................................. 34

*Burndy Corp. v. Teledyne Indus., Inc.,*
  748 F.2d 767 (2d Cir. 1984) ................................................. 40

*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986) ........................................................... 13

*DeClemente v. Columbia Pictures Indus., Inc.,*
  860 F.Supp. 30 (E.D.N.Y. 1994) ......................................... passim

*Dorpan, S.L. v. Hotel Meliá, Inc.,*
  728 F.3d 55 (1st Cir. 2013) ................................................. 33

*Dreamwerks Prod. Group, Inc. v. SKB Studio,*
  142 F.3d 1127 (9th Cir. 1998) ............................................... 17

*Estee Lauder Inc. v. The Gap, Inc.,*
  108 F.3d 1503 (2d Cir. 1997) ................................................. 14

*George Basch Co., Inc. v. Blue Coral, Inc.,*
  968 F.2d 1532 (2d Cir. 1992) ........................................ 14, 38, 39

*Grout Shield Distribs., LLC v. Elio E. Salvo, Inc.,*
  824 F.Supp.2d 389 (E.D.N.Y. 2011) ........................................ 34

*Gruner + Jahr USA Publ'g v. Meredith Corp.,*
  991 F.2d 1072 (2d Cir. 1993) ........................................ 13, 23, 33

*Gucci Am., Inc. v. Duty Free, Ltd.,*
  286 F.Supp.2d 284 (2d Cir. 2003) .......................................... 13

*Gucci Am., Inc. v. Guess?, Inc.*,
  868 F.Supp.2d 207 (S.D.N.Y. 2012) ............................................................ 39, 40

*Haven Capital Mgmt., Inc. v. Havens Advisors, LLC*,
  965 F.Supp.528 (S.D.N.Y. 1997) ...................................................................... 35

*Hormel Foods Corp. v. Jim Henson Prod., Inc.*,
  73 F.3d 497 (2d Cir. 1996) ................................................................................ 23

*ImOn, Inc. v. ImaginOn, Inc.*,
  90 F.Supp.2d 345 (S.D.N.Y. 2000) .................................................................... 28

*Inc. Publ'g Corp. v. Manhattan Magazine, Inc.*,
  616 F.Supp. 370 (S.D.N.Y. 1985) ...................................................................... 34

*Johnny Blastoff, Inc. v. Los Angeles Rams Football Co.*,
  188 F.3d 427 (7th Cir. 1999) ............................................................................. 39

*Juicy Couture, Inc. v. L'Oreal USA, Inc.*,
  No. 04 Civ. 7203, 2006 WL 1359955 (S.D.N.Y. May 18, 2006)........................ 40

*King Research, Inc. v. Shulton, Inc.*,
  454 F.2d 66 (2d Cir. 1972) ................................................................................ 16

*Knight v. US. Fire Ins. Co.*,
  804 F.2d 9 (2d Cir. 1986) .................................................................................. 13

*Lang v. Ret. Living Publ'g Co.*,
  949 F.2d 576 (2d Cir. 1991) ........................................................................ passim

*Life Indus. Corp. v. Ocean Bio-Chem, Inc.*,
  827 F.Supp. 926 (E.D.N.Y. 1993) ................................................................ 14, 38

*Louis Vuitton Malletier v. Dooney & Bourke, Inc.*,
  454 F.3d 108 (2d Cir. 2006) .............................................................................. 23

*M&G Elecs. Sales Corp. v. Sony Kabushiki Kaisha*,
  250 F.Supp.2d 91 (E.D.N.Y. 2003) ............................................................. passim

*Maternally Yours, Inc. v. Your Maternity Shop, Inc.*,
  234 F.2d 538 (2d Cir. 1956) .............................................................................. 14

*Mattel, Inc. v. Robarbs's, Inc.*,
  139 F.Supp.2d 487 (S.D.N.Y. 2001) .................................................................. 40

*Merriam–Webster, Inc. v. Random House, Inc.*,
  35 F.3d 65 (2d Cir. 1994) .................................................................................. 33

*Mondo, Inc. v. Sirco Int'l Corp.*,
 No. 97 Civ. 3121, 1998 WL 849401 (S.D.N.Y. Dec. 7, 1998)................................................. 20

*Montblanc-Simplo v. Aurora Due S.r.L.*,
 363 F.Supp.2d 467 (2d Cir. 2005) ................................................................................. 16, 19

*Murphy Door Bed Co., Inc. v. Interior Sleep Sys., Inc.*,
 874 F.2d 95 (2d Cir. 1989) ............................................................................................. 21, 27

*Mushroom Makers, Inc. v. R.G. Barry Corp.*,
 580 F.2d 44 (2d Cir. 1978) ................................................................................. 14, 16, 19, 22

*National Distillers Prods. Co., LLC v. Refreshment Brands, Inc.*,
 No. 00-8418, 2002 WL 1766548 (S.D.N.Y. 2002) ............................................................. 17

*Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*,
 269 F.3d 114 (2d Cir. 2001) ................................................................................. 14, 20, 33

*Paco Sport, Ltd. v. Paco Rabanne Parfums*,
 86 F.Supp.2d 305 (S.D.N.Y. 2000) ................................................................................. 22

*Parenting Unlimited Inc. v. Columbia Pictures Television Inc.*,
 743 F.Supp. 221 (S.D.N.Y. 1990) ................................................................................. 34

*Plus Products v. Plus Discount Foods, Inc.*,
 722 F.2d 999 (2d Cir. 1983) ................................................................................. 34, 36

*Polaroid Corp. v. Polarad Elecs. Corp.*,
 287 F.2d 492 (2d Cir. 1961) ................................................................................. 16, 22

*Quinn v. Syracuse Model Neighborhood Corp.*,
 613 F.2d 438 (2d Cir. 1980) ................................................................................. 13

*Romag Fasteners, Inc. v. Fossil, Inc.*,
 817 F.3d 782 (Fed. Cir. 2016) ................................................................................. 14, 38, 39

*Rush Indus., Inc. v. Garnier LLC*,
 496 F.Supp.2d 220 (E.D.N.Y. 2007) ................................................................................. 23

*Sales v. Sony Kabushiki Kaisha*,
 250 F.Supp.2d 91 (E.D.N.Y. 2003) ................................................................................. 27

*Savin Corp. v. Savin Group*,
 391 F.3d 439 (2d Cir. 2004) ................................................................................. passim

*Savin Corp. v. Savin Group*,
 No. 02cv9377, 2003 WL 22451731 (S.D.N.Y. Oct. 24, 2003) ......................................... 19, 30

*Self-Realization Fellowship Church v. Ananda Church of Self-Realization*,
    59 F.3d 902 (9th Cir. 1995) ............................................................................... 31

*Spring Mills, Inc. v. Ultracashmere House, Ltd.*,
    689 F.2d 1127 (2d Cir. 1982) ........................................................................... 23

*Star Indus. v. Bacardi & Co.*,
    412 F.3d 373 (2d Cir. 2005) ............................................................................. 31

*Starter Corp. v. Converse, Inc.*,
    170 F.3d 286 (2d Cir. 1999) ............................................................................. 40

*Sterling Drug, Inc. v. Bayer AG*,
    14 F.3d 733 (2d Cir. 1994) ............................................................................... 17

*Streetwise Maps, Inc. v. Vandam, Inc.*,
    159 F.3d 739 (2d Cir. 1998) ....................................................................... 14, 16

*Sunenblick v. Harrell*,
    895 F.Supp. 616 (S.D.N.Y. 1995) ........................................................ 17, 21, 25

*The Apollo Theater Found., Inc. v. W. Int'l Syndication*,
    No. 02 Civ. 10037, 2005 WL 1041141 (S.D.N.Y. May 5, 2005) ........................... 40

*Therma-Scan, Inc. v. Thermoscan, Inc.*,
    295 F.3d 623 (6th Cir. 2002) ........................................................................... 33

*Uber Promotions, Inc. v. Uber Techs., Inc.*,
    162 F.Supp.3d 1253 (N.D. Fla. 2016) ............................................................... 33

*Vision, Inc. v. Parks*,
    610 F.Supp. 927 (S.D.N.Y. 1985) ..................................................................... 34

*Vitarroz Corp. v. Borden, Inc.*,
    644 F.2d 960 (2d Cir. 1981) ............................................................................. 36

*W.W.W. Pharm. Co. v. Gillette Co.*,
    984 F.2d 567 (2d Cir. 1993) ..................................................................... passim

## STATUTES

15 U.S.C. § 1057(b) ...................................................................................... 16, 19

15 U.S.C. § 1115(a) .................................................................................. 16, 19, 22

15 U.S.C. § 1125(c)(2) ........................................................................................ 40

15 U.S.C.A. § 1125(a) ........................................................................................ 29

15 U.S.C.A. § 1127 ........................................................................................................ 29

Lanham Act, § 32 .......................................................................................................... 13

Lanham Act, § 43(a) ............................................................................................... 13, 29

Lanham Act, § 45 .......................................................................................................... 29

## OTHER AUTHORITIES

4 J. Thomas McCarthy,
    McCarthy on Trademarks & Unfair Competition (5th ed. 2017) ................................ 14, 17, 39

## RULES

Fed. R. Civ. P. 56 .......................................................................................................... 13

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendant Gimlet Media, Inc. ("Gimlet Media" or "Defendant"), by and through its attorneys, respectfully submits this Combined Memorandum of Law, and the Declaration of Stephanie G. Stella ("Stella Decl."), and exhibits thereto, in support of its motions for summary judgment in favor of Gimlet Media on all causes of action and claims for damages asserted by Plaintiff Reply All Corp. ("Plaintiff").

Summary judgment is appropriate because there is no genuine dispute as to any material fact related to Gimlet Media's ownership and non-infringing use of its federally registered REPLY ALL trademark. Under the applicable federal statutes and precedential case law, the undisputed evidence establishes that Gimlet Media is entitled to use its REPLY ALL Mark in connection with its narrative storytelling podcasts, and that there is no likelihood of confusion in the marketplace with Plaintiff's use of its REPLYALL mark in connection with its entirely different software product—a basic publishing tool or embeddable widget used to publish email-type text-based content online, by embedding a single line of code on a webpage.

## I.     <u>INTRODUCTION</u>

To be blunt, this suit is Plaintiff's attempt to extort an unjust windfall from Defendant Gimlet Media—who owns a federal registration for its REPLY ALL trademark for podcasts[1]— as retribution for Gimlet Media's decision not to feature Plaintiff in Defendant's inaugural podcast series. It is obvious from the Parties' audio-recorded and subsequent email-based settlement negotiations that Plaintiff's CEO Zach Abramowitz enthusiastically participated in discussions with Gimlet Media—during which discussions Plaintiff heaped praise on Defendant and its podcasts, and offered to license the REPLY ALL mark to Gimlet for $1 annually in perpetuity—until the precise moment when Gimlet Media confirmed to Plaintiff that, based on

---

[1] Stella Decl. ¶ 1, Ex. A, Prosecution ("Pros.") History of Gimlet Media's U.S. Reg. No. 4,817,504 for REPLY ALL for "entertainment services, namely, providing podcasts on the subject of the internet" (first use: Nov. 6, 2014).

advice of counsel and as a matter of journalistic integrity, Gimlet Media could not offer Plaintiff a quid pro quo—i.e., publicity on a podcast in exchange for settling the Parties' legal dispute.[2]

The record shows that, despite the passage of nearly three since Gimlet's decision, Mr. Abramowitz refuses to accept Defendant's explanation for denying him his "15 minutes." For example, Mr. Abramowitz: (1) testified in October 2017, "they told me that they couldn't publish [the audio-recorded settlement negotiations] because it violated their journalistic integrity and it appeared we were exchanging the license agreement for doing a story [] on the *StartUp* podcast… *what I felt was a very poor answer*…"[3]; and (2) has been obsessed with eliciting a "better" or "more acceptable" answer, as evidenced by Plaintiff's service in this case of *no fewer than eleven related discovery requests*—all of which demand that Gimlet Media supply that "better" answer.[4]

Despite the hard fact that most startups fail, Plaintiff, since its inception, has loftily compared itself (e.g., in its business plan and at deposition) to the rare startup "unicorns" like Twitter, Facebook, Foursquare and Pinterest—each of which has a valuation of at least $1B.[5] In reality, Plaintiff never found a way to monetize its sole product—which it gives away for free— and utterly failed as a startup long before Gimlet Media published its first *Reply All* podcast episode.[6] Plaintiff to date has not spent a penny on marketing or advertising in the five plus years

---

[2] Stella Decl. ¶ 2, Ex. B, Dec. 2, 2014 Audio Recording of the Parties' Settlement Discussions ("Dec. 2, 2014 Audio Recording"); Stella Decl. ¶ 3, Ex. C, Plaintiff's ("Pl.") Dec. 2014 Proposed Licensing Agreement; Stella Decl. ¶¶ 4–6, Exs. D–F, Parties' Dec. 2–18, 2014 Email Negotiations. *See also* Amended Complaint (D.I. 71, at 9 ¶¶ 35–36) (Pl.'s allegations of bad faith relating to the $1 licensing agreement).

[3] Stella Decl. ¶ 7, Ex. G, Transcript ("Tr.") of October 20, 2017 30(b)(6) Deposition of Plaintiff ("10/20/17 Pl.'s 30(b)(6) Tr.") at 35:21–36:8 (emphasis added).

[4] Stella Decl. ¶ 8, Ex. H, Pl.'s Interrogatories, Nos. 23–25; Stella Decl. ¶ 9, Ex. I, Pl.'s Req. for Production, Nos. 23–25; Stella Decl. ¶ 10, Ex. J, Pl.'s Req. for Admission, Nos. 36–40 (all served Dec. 3, 2015).

[5] "A unicorn is a startup company valued at over $1 billion. The term was coined in 2013 by venture capitalist Aileen Lee, choosing the mythical animal to represent the statistical rarity of such successful ventures." Stella Decl. ¶ 11, Ex. K, Wikipedia ,"Unicorn (finance)." Although Plaintiff testified that an expert is required to calculate Plaintiff's valuation, it assigned itself "a pre-money valuation" in the millions of dollars without any basis for doing so. Stella Decl. ¶ 12, Ex. L, Transcript of September 13, 2016 30(b)(6) Deposition of Plaintiff/Zach Abramowitz ("9/13/16 Pl.'s 30(b)(6)/Abramowitz Tr.") at 280:19–288:16; 340:21–341:8.

[6] Stella Decl. ¶ 12, Ex. L, 9/13/16 Pl.'s 30(b)(6)/Abramowitz Tr. at 207:24–226:2. Plaintiff has not even produced financial statements in this case, but only a handful of invoices and cancelled checks.

since its launch, and has no advertising budget and no plans for a future budget.[7] Although a few entities have paid to learn how to use its software,[8] Plaintiff has had only negligible sales,[9] the very first of which came in December 2015[10]—more than a year after the launch of Gimlet's *Reply All* podcast. Plaintiff's only two employees left the United States for Israel—Mr. Abramowitz in 2014 and Mr. Gold in 2015—and Plaintiff thus has no physical presence in the United States.[11] Plaintiff nevertheless insists that, but for Gimlet Media's use of the name REPLY ALL for a podcast, Plaintiff would have been a unicorn. Unfortunately for Plaintiff, the record is devoid of even a shred of evidence to support such a claim.

## II.    BACKGROUND

### A.    Defendant Gimlet Media, Inc.

Launched in New York City in 2014, Gimlet Media is an award-winning narrative journalism and storytelling podcast production company that "aims to help listeners better understand the world and each other."[12] Co-founder and CEO Alex Blumberg brought to Gimlet Media a built-in fan base from his time as a radio journalist and former producer at *This American Life*, where he hosted the *Planet Money* podcast.[13] Gimlet's Co-founder and President

---

[7] *Id.* at 262:23–264:18; Stella Decl. ¶ 7, Ex. G, 10/20/17 Pl.'s 30(b)(6) Tr. at 166:23–170:8.

[8] Stella Decl. ¶ 12, Ex. L, 9/13/16 Pl.'s 30(b)(6)/Abramowitz Tr. at 209:9–210:15.

[9] *Id.* at 207:24–226:2. Plaintiff testified it expected to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Stella Decl. ¶ 7, Ex. G, 10/20/17 Pl.'s 30(b)(6) Tr. at 99:14–101:13.

[10] Stella Decl. ¶ 13, Ex. M, Invoice for Dec. 15–19, 2015 Services; Stella Decl. ¶ 12, Ex. L, 9/13/16 Pl.'s 30(b)(6)/Abramowitz Tr. at 233:23–238:23 (explaining that the Dec. 2015 services were the first Plaintiff sold in connection with its software). Plaintiff's new users registrations also increased in the year after Gimlet's *Reply All* podcast launch, peaking in October 2015. *Id.* at 343:13–346:16.

[11] Plaintiff's "corporate mailing address" is a friend's NYC apartment. Stella Decl. ¶ 7, Ex. G, 10/20/17 Pl.'s 30(b)(6) Tr. at 11:21–12:24.

[12] Stella Decl. ¶ 14, Ex. N, Gimlet Media Website Screenshot; *infra* note 196. Gimlet was originally incorporated as the American Podcasting Corporation, but in Fall 2014, it changed its name to Gimlet Media. Stella Decl. ¶ 15, Ex. O, Transcript of Sept. 15, 2016 30(b)(6) Deposition of Gimlet Media/Matthew Lieber ("Lieber Tr.") at 42:22–46:17.

[13] Stella Decl. ¶ 16, Ex. P, LinkedIn, "Alex Blumberg"; Stella Decl. ¶ 17, Ex. Q, Kara Bloomgarden-Smoke, *Can Former Planet Money Host Build the 'HBO of Podcasts'?*, OBSERVER, Feb. 27, 2015. Stella Decl. ¶ 18, Ex. R, Tr. of Sept. 14, 2016 Depo. of Austin Feld ("Feld Tr.") at 77:21–24; 78:6–9; 81:13–19; 90:11–24; Stella Decl. ¶ 19, Ex. S, *ReplyAll and the Battle for Storytelling About the Net*; Stella Decl. ¶ 12, Ex. L, 9/13/16 Pl.'s 30(b)(6)/Abramowitz Tr. 100:21–102:7 ("I'm not an expert on podcasts, but … it probably pays to bring your own follow[ing].").

Matt Lieber likewise brought to Gimlet his own following from his time producing radio shows and podcasts for MTV Networks, NPR and WNYC Radio.[14]

Gimlet Media's primary business is entertainment services, i.e., "the production and monetization of podcasts,"[15] and its sophomore creation, entitled *Reply All*—each episode of which tells a story that has a link (whether significant or trivial) to the internet—is the service that is the target of Plaintiff's infringement claim. Creating and publishing the *Reply All* podcast requires tremendous time and financial investments, with annual expenses (not including overhead) totaling ████████████.[16] Each episode is highly produced and edited, and involves numerous researchers, writers, producers and hosts, who script, write, record, edit and mix each show, often using hundreds of hours of audio recordings to arrive at 25–50 minute episodes that are published for public consumption.[17] An episode typically includes at least one narrator, and the consumer experience is similar to watching a documentary.[18] Gimlet Media's podcasts are available for streaming and download via distribution platforms, e.g., SoundCloud, Spotify and iTunes—the last of which is the source of the majority of Gimlet Media's customers—and by subscription service.[19] Gimlet's services, unlike Plaintiff's, are not web-based and thus do not require a web browser or visit to a webpage, but require only a passive connection to the internet, so that a listener need only, e.g., plug in his earbuds and hit "play."

Gimlet Media was unaware of Plaintiff's existence when it selected the REPLY ALL Mark, arriving at the name independently in Fall 2014 during a brainstorming session attended by *Reply All* podcast hosts PJ Vogt and Alex Goldman (and Mr. Goldman's wife) about what to

---

[14] Stella Decl. ¶ 15, Ex. O, Lieber Tr. at 17:20–19:11.

[15] Stella Decl. ¶ 20, Ex. T, Tr. of Oct. 20, 2017 Depo. of Gimlet's VP of Finance Jim Grau ("Grau Tr.") at 17:21–18:2.

[16] Stella Decl. ¶ 21, Ex. U, *Reply All* Profit and Loss Statement (Jan. – Dec. 2016); Stella Decl. ¶ 22, Ex. V, *Reply All* Profit and Loss Statement (Jan. – Sept. 2017).

[17] Stella Decl. ¶ 15, Ex. O, Lieber Tr. 47:3–8; 73:12–74:10; 89:7–90:13.

[18] *Id.* at 90:2–13.

[19] *Id.* at 88:3–18. Gimlet's podcasts are also accessible via Google Play Music, Stitcher, Instacast, Overcast, Downcast, TuneIn and MPR1. *Id.*

name their new podcast. The hosts wanted a name that, like their previous podcast show, *TLDR*, had a connection to the internet.[20] Gimlet Media has produced in this case the notes (containing 27 proposed podcast titles) taken by Mr. Goldman's wife during that session, at which Gimlet Media arrived at the name *Reply All*.[21] Gimlet Media then worked with a professional branding company to develop what would become the accused logo in this case, which logo incorporates the universal double-arrow symbol for the "reply all" email command: ↩.[22]

Mr. Lieber subsequently searched the U.S. Patent and Trademark Office ("USPTO") website, discovered that Plaintiff's mark was registered only for software (and that third party Donna Lewis' REPLY ALL registration was only for online comics), and determined that Plaintiff's software (and Ms. Lewis' online comic strip) was unrelated to Gimlet Media's entertainment services. Thus, Gimlet had no reason to believe that using the same name for its podcast show would infringe Plaintiff's (or Ms. Lewis') mark. Mr. Lieber's conclusion was subsequently confirmed not only by counsel,[23] but also by the USPTO when, on September 22, 2015, Gimlet Media's REPLY ALL mark registered, without any reference to Plaintiff's (or to Ms. Lewis') registration.[24] Gimlet Media has been using the REPLY ALL mark in connection with its podcast since at least as early as November 6, 2014.[25]

As confirmed by Gimlet Media's financial statements and its testimony, Gimlet Media has spent and continues to spend *nothing* on marketing and advertising its accused *Reply All* podcast (or any other of its podcasts).[26] Rather, Gimlet Media has found success in the podcasting space via organic growth, including strong word-of-mouth of its listeners and fans,

---

[20] *Id.* at 79:17–84:7.
[21] *Id.* at 79:17–84:7; Stella Decl. ¶ 23, Ex. W, Notebook Page of *Reply All* Podcast Host's Wife re: Brainstorming.
[22] Stella Decl. ¶ 15, Ex. O, Lieber Tr. at 163:4–164:9; Stella Decl. ¶ 24, Ex. X, Nov. 18, 2014 Athletics Branding Co. Slide Deck Proposing Reply All Logo. Gimlet no longer uses the original logo with the double-arrow symbol.
[23] Stella Decl. ¶ 15, Ex. O, Lieber Tr. 120:18–123:18.
[24] *See supra* note 1; Stella Decl. ¶ 15, Ex. O, Lieber Tr. 120:18–123:18.
[25] *Id.*
[26] Stella Decl. ¶ 15, Ex. O, Lieber Tr. at 167:24–168:2.

critical media acclaim, industry awards, and the stellar reputations in the journalism and podcasting industries of its founders, producers and podcast hosts.[27] Defendant now has 100 employees who have contributed to the production of at least 17 podcast shows.[28]

### B.   Plaintiff Reply All Corp.

Plaintiff, incorporated in Delaware in 2012, is a technology startup, specifically, a software developer, with two employees and a single software product—"a basic publishing tool"[29] or "embeddable widget"[30] used to publish email-type text-based content by "embed[ding] a single line of code" on a webpage, i.e., on third-party websites.[31] Plaintiff was the creation of two friends—a corporate lawyer (Plaintiff's CEO[32] Zach Abramowitz) and a tax accountant (Plaintiff's Head of Product Ari Gold)—who believed their personal email exchanges were so interesting that they wished they had a means to publish them.[33] Mr. Abramowitz and Mr. Gold enlisted a software engineer to write the software code for the publishing tool.[34] None of the founders had any experience launching or running a company—startup or otherwise.[35]

As noted above, Plaintiff's product is a basic publishing tool or embeddable widget used to publish email-type text-based content by embedding it on a webpage—as Plaintiff's website

---

[27] *See supra* note 13; *infra* note 196.

[28] Stella Decl. ¶ 20, Ex. T, Grau Tr. at 16:19–17:14; Stella Decl. ¶ 25, Ex. Y, Screenshot Gimlet website-show titles.

[29] Stella Decl. ¶ 26, Ex. Z, Osman Husein, '*Storify for conversations' turns discussions into great content*, TECH IN ASIA, Nov. 17, 2015. The article, for which Plaintiff was interviewed, states that Plaintiff quickly learned that most of its users "had their own blog or website and would prefer to publish it there. So after a few months, Reply All pivoted and built a basic publishing tool."

[30] Stella Decl. ¶ 27, Ex. AA, *ReplyAll Debuts The World's First "Blogcasting" Service*, SERIOUS STARTUPS, Nov. 22, 2013. The article notes that Plaintiff "is launching an embeddable widget that allows these ongoing conversations to be embedded on any website or blog." The embeddable widget is all that remains of Plaintiff's product.

[31] *See id.; supra* note 29; Stella Decl. ¶ 12, Ex. L, 9/13/16 Pl.'s 30(b)(6)/Abramowitz Tr. at 47:13–14; 80:13–83:17.

[32] Mr. Abramowitz testified he is Plaintiff's General Counsel (Stella Decl. ¶ 12, Ex. L, 9/13/16 Pl.'s 30(b)(6)/Abramowitz Tr. at 40:19–24), and Plaintiff touts in its business plan "Mr. Abramowitz's background as a corporate lawyer has kept legal costs low" (Stella Decl. ¶ 28, Ex. BB, Pl.'s Sept. 2012 Business Plan, at 12).

[33] *See, e.g.,* Stella Decl. ¶ 2. Ex. B, Dec. 2, 2014 Audio Recording, at 1:20–3:45; Stella Decl. ¶ 29, Ex. CC, Y Combinator, at 1; Stella Decl. ¶ 30, Ex. DD, Product Hunt Q&A at 1; *supra* notes 29–31; Stella Decl. ¶ 12, Ex. L, 9/13/16 Pl.'s 30(b)(6)/Abramowitz Tr. at 80:24–81:11.

[34] Stella Decl. ¶ 12, Ex. L, 9/13/16 Pl.'s 30(b)(6)/Abramowitz Tr. at 60:14–64:2.

[35] *See id.* at 39:17–43:5; 51:12–55:21; 214:4–217:17; 218:25–220:4, Stella Decl. ¶ 28, Ex. BB, Pl.'s Bus. Plan, at 15.

touts, using its software is "just you and your guest emailing back and forth…."[36] The basic

nature of the software is illustrated in the following excerpt, in which Plaintiff—despite Gimlet

Media's repeated requests that it not do so until the Parties' dispute was settled[37]—used its

software to publish on its website the Parties' email-based settlement negotiations[38]:



The above excerpt exemplifies the basic nature of Plaintiff's software, which merely displays

textual content in "chat bubbles." Indeed, Plaintiff considered adopting a logo that incorporated

two chat bubbles in the rectangular shape illustrated above.[39]

Mr. Abramowitz himself wrote the identification of services recited in Plaintiff's

registration certificate—narrowly—as "computer services, namely, creating an on-line

community for registered users to form groups and create publicly viewable conversations where

group members are the only individuals who can contribute to the conversation."[40] The

identification language tracks Plaintiff's original but long-since-abandoned vision, namely, that

---

[36] Stella Decl. ¶ 38, Ex. JJ.
[37] *See, e.g.*, Stella Decl. ¶ 4, Ex. D, Dec. 6, 2014 Email from Gimlet to Plaintiff, at 9 (GM00017); Stella Decl. ¶ 5, Ex. E, Dec. 9, 2014 Email from Gimlet to Plaintiff, at 1.
[38] See Stella Decl. ¶¶ 4–6, Exs. D–F, Parties' Dec. 2–18, 2014 Email Negotiations, and Stella Decl. ¶ 31, Ex. EE, Mr. Abramowitz Publishes Parties' Settlement Negotiations on Pl.'s Website.
[39] Stella Decl. ¶ 12, Ex. L, 9/13/16 Pl.'s 30(b)(6)/Abramowitz Tr. at 323:12–326:8. Plaintiff considered using a logo with "two chat bubbles … like a box and another box," in place of the arrows. *Id.* at 326:4–8.
[40] *Id.* at 139:19–140:3.

"someone who started a conversation on [Plaintiff's website] and wanted other people to read their conversation [could] share a link from [Plaintiff's website]," which link would allow the invitee to "follow along like a fly on the wall."[41] As Plaintiff stated, "that *was* sort of our big idea that we *were* going to create this one central online place," i.e., the "on-line community."[42]

Plaintiff was unable to draw traffic to its website, however, because its users were interested in the software only for the purpose of publishing content *on their own websites*.[43] Thus, in or around June 2014—at least five months before Gimlet Media published its first *Reply All* episode—Plaintiff abandoned the services recited in its REPLYALL registration certificate,[44] and "pivoted and built a basic publishing tool."[45] Indeed, in September 2016, Plaintiff testified:

> And then in 2014, we realized that we could get much better distribution if we were living on other websites, number one, as an embed . . . What we thought at the time and what we still think is that ultimately we will be able to go back to a system where all the conversations live on our site, but in the meantime, *it was the best way of getting traction was to build our brand on top of other websites that were, like, well-known and of good repute*.[46]

A visit to Plaintiff's website confirms that no such "on-line community for registered users" exists,[47] and Plaintiff's October 2017 testimony confirms that it has completely abandoned the idea of eventually resurrecting that online community.[48]

Plaintiff has never charged for use of its web-based computer software—access to the software is free to registered users who must visit Plaintiff's website, create an account, verify that account after receiving from Plaintiff an email with a link, and login to the account via Plaintiff's webpage. A user must then send an email invitation to another individual, who must

---

[41] *Id.* at 80:18–81:11; 86:13–90:4.

[42] *Id.* at 80:21–23.

[43] *See supra* notes 29–31.

[44] "As Plaintiff's principal testified, "[t]he 'on-line community for registered users' *was* the ReplyAll [web]site …." Stella Decl. ¶ 12, Ex. L, 9/13/16 Pl.'s 30(b)(6)/Abramowitz Tr. at 138:10–16 (emphasis added).

[45] *See supra* notes 29–31.

[46] Stella Decl. ¶ 12, Ex. L, 9/13/16 Pl.'s 30(b)(6)/Abramowitz Tr. at 83:4–17 (emphasis added).

[47] Stella Decl. ¶ 32.

[48] Stella Decl. ¶ 7, Ex. G, 10/20/17 Pl.'s 30(b)(6) Tr. at 56:20–58:14; 45:2–4.

repeat the above process before the parties can have an email-type conversation. Only then may the registrants use Plaintiff's publishing tool to embed the text-based content into a webpage.[49]

In contrast to Gimlet's podcasts, the sole access channel to Plaintiff's software is via its website portal. Its users are thus required to visit the world wide web in order to access the software. Users of Plaintiff's services must be on a computer, logged into their accounts on Plaintiff's website, and actively engaged in the use of Plaintiff's software. Gimlet, on the other hand, offers streamable and downloadable podcasts on a variety of topics, one podcast being called *Reply All*. Listeners may subscribe to Gimlet's podcasts, but there is no interaction between the listener and Gimlet; it is merely a passive listening experience that typically occurs via smartphone or other mobile device, often while listeners are engaged in other activities.

### C.   The Parties' Dispute

On November 6, 2014, Gimlet Media published its first *Reply All* podcast episode.[50] The following month, Plaintiff charged Gimlet Media with infringement of its mark and soon thereafter proposed that Gimlet take a license for a fee of $1 annually in perpetuity.[51] Gimlet, despite its belief that the Parties' marks are not confusingly similar, but in an effort to resolve the matter amicably and to avoid the cost of protracted litigation, agreed to consider taking a license.[52] In its discussions with Plaintiff, Gimlet explored the possibility of Plaintiff's principal appearing on a podcast.[53]

### 1.   The December 2, 2014 Audio-Recorded Negotiations

Gimlet Media invited Plaintiff to record the Parties' settlement negotiations, potentially for publication on Gimlet's *StartUp* podcast, the theme of which was the launch of Gimlet Media. The December 2, 2014 meeting was attended by Plaintiff's CEO Zach Abramowitz, and

---

[49] Stella Decl. ¶ 12, Ex. L, 9/13/16 Pl.'s 30(b)(6)/Abramowitz Tr. at 86:13–90:4; 191:20–25; 207:24–226:2.
[50] *See supra* note 1.
[51] *See supra* note 2; Stella Decl. ¶¶ 2–3, Exs. B–C, Dec. 2014 Audio Recordings & Proposed Licensing Agreement.
[52] Stella Decl. ¶ 15, Ex. O, Lieber Tr. at 90:14–119:14.
[53] *Id.*

by Gimlet Media's co-founders, CEO Alex Blumberg and President Matthew Lieber. Although Gimlet Media had consulted with counsel prior to the discussion, its counsel was not present.

During the meeting, Plaintiff heaped praise on Gimlet Media and its podcasts,[54] and reiterated its offer to license the REPLY ALL mark to Gimlet Media for $1 annually in perpetuity.[55] However, Mr. Abramowitz showed up wearing his "lawyer hat"[56]—repeatedly reminding Gimlet that he was an attorney, "I'm speaking as an ex-lawyer … I am the attorney on the team"—and rattled off the "standard for infringement" and his (mis)understanding of trademark infringement law, in detail.[57] Mr. Abramowitz further presented a number of demands to Gimlet Media, including that it change its logo to delete the global double-arrow symbol for "reply all," and surrender its Twitter handle, both of which demands Gimlet believed were unreasonable.[58]

Gimlet's unease with the direction of the negotiations crystallized when Mr. Blumberg broached the critical matter of journalistic integrity, and strongly cautioned Mr. Abramowitz regarding the proposed quid pro quo:

> "Journalistically it's a little tricky … Coming from NPR you, you, you absolutely cannot do what we're talking about doing … This would be a gigantic journalistic no-no … Offering somebody publicity in exchange for dropping a lawsuit is um, you know, you just can't do … We're fucking dipping into a grey area once again here in a way that's, like, a little bit, um, makes me, makes me, skeeves me out a little bit … our listeners— that's, that's who we're responsible to … The way you grow a big audience is by, is by maintaining trust with your listeners, so…."[59]

---

[54] Stella Decl. ¶ 2, Ex. B, Dec. 2, 2014 Audio Recording. Mr. Abramowitz stated: "It's great to meet you guys." "I love what you're building." "I'm a huge podcast fan." "I'm obsessed." "I think what you guys are doing is great." "We like you." "You're really responsive."

[55] *See supra* note 2.

[56] *See supra* note 32.

[57] Stella Decl. ¶ 2, Ex. B, Dec. 2, 2014 Audio Recording, at 5:30–6:15; 11:15–12:00; 21:13–21:25; 22:45–2; 26:25– 27:50; 36:05–36:37. Although Mr. Abramowitz held himself out as an expert on trademark law during the December 2014 negotiations with Gimlet, he has changed his tune since the inception of this suit, repeatedly testifying he is not an expert in trademark law—or in podcasts. Stella Decl. ¶ 12, Ex. L, 9/13/16 Pl.'s 30(b)(6)/Abramowitz Tr. at 102:4–5; 110:13–24; 133:25–135:7; 143:17–145:14; 166:13–24; 167:6–168:16; 178:14– 22; 280:21–23; 281:13–15; 294:21–295:18; 339:10–11.

[58] Stella Decl. ¶ 15, Ex. O, Lieber Tr. at 97:11–20; 99:17–102:19; 108:6–110:4.

[59] Stella Decl. ¶ 2, Ex. B, Dec. 2, 2014 Audio Recording, at 36:37–38:34.

Yet, Mr. Abramowitz, seemingly oblivious to Gimlet's obvious apprehensions, continued to press Gimlet for a platform on its podcast, effusively stating, "You do have an audience that I want to reach," and, "In a perfect world you guys would feature us up on the *StartUp* podcast."[60] Mr. Abramowitz's inability to grasp the gravity of the situation was on full display when he interrupted Mr. Lieber to give "a quick shout out" to his cofounders, and to talk about his mom listening to him on Gimlet's podcast.[61]

### 2.  The Parties December 2–18, 2014 Email Negotiations

The Parties' email negotiations, which included Gimlet's prior counsel, began on December 2, 2014—the same day the settlement meeting was recorded. Only a week into email negotiations, during which time the Parties frequently corresponded to trade redlined revisions to Plaintiff's proposed $1 licensing agreement, and while Gimlet worked diligently to get the deal done, Mr. Abramowitz broke from the negotiations to initiate a separate email thread, again, to press Gimlet about his podcast appearance.[62] Email negotiations continued until late December, when Gimlet Media notified Plaintiff it would not be using the recorded negotiations in its podcast.[63]

### D.  The Failed Settlement Negotiations and Their Aftermath

Since the Parties' negotiations terminated, Plaintiff has repeatedly accused Gimlet Media of infringement online, via social media and during live chats on the Product Hunt (a product sharing site) and Y Combinator (a seed accelerator) websites.[64] Plaintiff also published the

---

[60] *Id.* at 19:55–20:22; 31:06–31:30.

[61] *Id.* at 16:53–17:13: 28:51–29:50.

[62] Stella Decl. ¶ 6, Ex. F, Parties' Dec. 9–11, 2014 Email Negotiations.

[63] Stella Decl. ¶¶ 4–6, Exs. D–F, Parties' Dec. 2–18, 2014 Email Negotiations. Plaintiff testified that the Parties had agreed to all license terms except quality control. Stella Decl. ¶ 7, Ex. G, 10/20/17 Pl.'s 30(b)(6) Tr. at 29:23–32:13. However, a December 16, 2014 email from Gimlet's prior counsel to Plaintiff confirms that Gimlet had agreed to that term. *See* Stella Decl. ¶ 5, Ex. E, Dec. 16, 2015 Email from Gimlet's Counsel to Plaintiff, at 6.

[64] *See, e.g.*, Stella Decl. ¶ 29, Ex. CC, at 2; Stella Decl. ¶ 30, Ex. DD, Product Hunt Q&A, at 3.

Parties' email-based settlement negotiations on Plaintiff's website, [65] thus inviting the web universe to opine on the matter.

*   *   *   *   *   *

Plaintiff's accusations continue despite the utter lack of probative evidence to support its infringement claim. And Plaintiff continues its posturing despite knowing that it has suffered no damage from an actions of Gimlet Media. It has not and cannot offer any proof of lost sales or damage to the economic value of its mark resulting from Gimlet Media's lawful use of the REPLY ALL Mark in connection with its podcasts—Plaintiff has neither placed any value on its mark, nor attempted to quantify any damages. Despite Plaintiff's claim that the success of Gimlet Media's Reply All podcast is responsible for Plaintiff's failure, Plaintiff has testified it cannot name a single investor or customer lost as a result of the same.[66] Plaintiff stopped pursuing investors to focus on generating revenues well prior to Gimlet Media's launch,[67] and not only has Plaintiff not resumed pitching to investors, but also recently testified that it has turned down investors who proposed to pitch to Plaintiff.[68]

Ultimately, the undisputed facts demonstrate that there is no likelihood of confusion between Plaintiff's and Gimlet Media's marks. The facts further show that Plaintiff has suffered no harm from Gimlet Media's use of the ubiquitous term "reply all" in an unrelated market for an unrelated service. In sum, there is no evidentiary basis for Plaintiff's claims and, accordingly, judgment should be entered summarily in favor of Defendant.

## III.   LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate where the record shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.[69] A fact

---

[65] See Stella Decl. ¶¶ 4–5, Exs. D–E, Parties' Dec. 2–18, 2014 Email Negotiations, and Stella Decl. ¶ 31, Ex. EE, Mr. Abramowitz Publishes Parties' Settlement Negotiations on Pl.'s Website.
[66] Stella Decl. ¶ 12, Ex. L, 9/13/16 Pl.'s 30(b)(6)/Abramowitz Tr. at 36:10–38:18; 206:22–207:12; 286:25–287:4; Stella Decl. ¶ 7, Ex. G, 10/20/17 Pl.'s 30(b)(6) Tr. at 73:19–74:19.
[67] Stella Decl. ¶ 12, Ex. L, 9/13/16 Pl.'s 30(b)(6)/Abramowitz Tr. at 20:7–26:23; 36:10–38:18.
[68] Stella Decl. ¶ 7, Ex. G, 10/20/17 Pl.'s 30(b)(6) Tr. at 75:6–76:25.

is "material" for purposes of summary judgment only when its resolution "might affect the outcome of the suit under the governing law," and a dispute is "genuine" only when "the evidence is such that a reasonable jury could return a verdict for the non-moving party."[70]

The U.S. Supreme Court has proclaimed that a principal purpose of summary judgment "is to isolate and dispose of factually unsupported claims or defenses."[71] To that end, summary judgment permits a court to streamline the process for terminating frivolous claims and to concentrate its resources on meritorious litigation.[72] As detailed below, this case is ripe for judgment in its entirety pursuant to these principles.

## IV.   ARGUMENT

### A.   Gimlet Media Is Entitled to Summary Judgment That There Is No Likelihood of Confusion.[73]

Summary judgment should be granted here because no reasonable jury could find a likelihood of confusion on the record in this case. Plaintiff has asserted claims under §§ 32 and 43(a) of the Lanham Act, and at New York common law. Because all of Plaintiff's claims are governed by the same Lanham Act standards, in order to prevail, Plaintiff must show that Gimlet Media's use of its own federally registered REPLY ALL mark is likely to cause confusion with Plaintiff's mark.[74] Plaintiff cannot succeed on its claims as a matter of law.

There is no case law directly on point where, like here, both plaintiff and defendant own federal registrations for their respective marks. Each Party's registration grants it the statutory presumption of an exclusive right to use its mark in commerce on or in connection with the

---

[69] Fed. R. Civ. P. 56(a),(c)(1)(A)–(B); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

[70] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[71] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

[72] *Knight v. US. Fire Ins. Co*., 804 F.2d 9, 12 (2d Cir. 1986) (citing *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir. 1980)).

[73] A claim of trademark infringement is analyzed under a two-prong test. The test looks first to whether the plaintiff's mark is entitled to protection, and second to whether the defendant's use of the mark is likely to cause consumers confusion as to the origin or sponsorship of the defendant's services. *See Savin Corp. v. Savin Group*, 391 F.3d 439, 456 (2d Cir. 2004) (internal citations omitted).

[74] *See Gruner + Jahr USA Publ'g v. Meredith Corp.*, 991 F.2d 1072, 1075 (2d Cir. 1993); *Gucci Am., Inc. v. Duty Free, Ltd.*, 286 F.Supp.2d 284, 287 (2d Cir. 2003).

services specified in the registration certificate. For that reason, and for those set forth below, likelihood of confusion in this case is nil, and damages are not available to Plaintiff.[75]

In this case, the crucial issue is whether there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be confused, mistaken, or deceived as to the source of the services in question.[76] "Likelihood of confusion is synonymous with 'probable' confusion—it is not sufficient if confusion is merely 'possible.'"[77] A probability of confusion may be found only when *a large number of purchasers* likely will be confused as to the source of the products in question.[78]

In its original complaint, Plaintiff asserted an infringement claim based on likelihood of *forward* confusion: i.e., confusion that the junior user's services emanate from or are associated with the senior user. Following its May 2017 substitution of counsel, Plaintiff—perhaps recognizing it had no case for forward confusion—amended its complaint to assert a claim of *reverse* confusion: when a junior user saturates the market with its mark and overwhelms a senior user to the point where consumers believe the senior user's services emanate from the junior user. Unfortunately for Plaintiff, however, the likelihood confusion in this case is nonexistent in both directions.

Plaintiff asserts in its complaint that it "provides [its REPLYALL software] services in the category of communication."[79] Plaintiff is well aware—yet wholly ignores for purposes of

---

[75] *Romag Fasteners, Inc. v. Fossil, Inc.*, 817 F.3d 782, 785–91 (Fed. Cir. 2016), *cert. granted, judgment vacated*, 137 S. Ct. 1373 (2017), *opinion reinstated in relevant part*, 686 Fed. Appx. 889 (Fed. Cir. 2017) (citing *George Basch Co. v. Blue Coral, Inc.*, 968 F.2d 1532, 1537–41 (2d Cir. 1992)); *DeClemente v. Columbia Pictures Indus., Inc.*, 860 F.Supp. 30, 53 (E.D.N.Y. 1994); *Life Indus. Corp. v. Ocean Bio-Chem, Inc.*, 827 F.Supp. 926, 933 (E.D.N.Y. 1993).

[76] *Savin Corp.*, 391 F.3d at 456 (quoting *Mushroom Makers, Inc. v. R.G. Barry Corp.*, 580 F.2d 44, 47 (2d Cir. 1978) (citing *Maternally Yours, Inc. v. Your Maternity Shop, Inc.*, 234 F.2d 538, 542 (2d Cir. 1956)).

[77] 4 J. Thomas McCarthy, McCarthy on Trademarks & Unfair Competition § 23:3 (5th ed. 2017), and cases cited therein. *See also Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 269 F.3d 114, 121 (2d Cir. 2001) (quoting *Estee Lauder Inc. v. The Gap, Inc.*, 108 F.3d 1503, 1510 (2d Cir. 1997); *Streetwise Maps, Inc. v. Vandam, Inc.*, 159 F.3d 739, 743 (2d Cir. 1998).

[78] *Nora Beverages*, 269 F.3d at 121 (quoting *Streetwise Maps*, 159 F.3d at 743) (emphasis added).

[79] D.I. 71, at 9 ¶ 33.

this case—that the term "reply all" has been in use for decades in connection with "software services in the category of communication," which services are quite similar to and indeed provided the inspiration for Plaintiff's REPLYALL software: namely, our common and every day email software.[80] Any email user knows that email software providers include in their products a "reply all" command, executed with click of a "reply all" button, which command is used to reply to group email. As Plaintiff has repeatedly stated, its REPLYALL software is used for "publishing email exchanges as content on [web]site[s]."[81] The term "reply all" thus has a highly suggestive connotation with regard to Plaintiff's services. On the other hand, as to Gimlet's podcast services, "reply all" has no meaning.

Nevertheless, Plaintiff posits its case on the proposition that no one else in any line of business can use the ubiquitous term "reply all" in a mark. For example, Plaintiff has made failed attempts to block former Governor Jeb Bush's use of the e-book title *Reply All: A Governor's Story 1999–2007*, and individual Donna Lewis' federal registration for REPLY ALL for her online comic strip (a quixotic attempt, since she had priority over Plaintiff's use by 1.5 years).[82]

Here, Plaintiff challenges Gimlet Media's use of its federally registered REPLY ALL Mark, and a logo containing the global double-arrow symbol for "reply all" (which symbol Gimlet Media no longer uses)—again, in an unrelated business—narrative storytelling and journalistic podcasts. Plaintiff refuses to recognize, however, that trademark law protects only

---

[80] Stella Decl. ¶ 2, Ex. B, Dec. 2014 Audio Recordings, at 12:06–12:40. Plaintiff joked with Gimlet Media that both parties knew exactly from where the "reply all" was taken: "Obviously, everyone knows where we took it from."
[81] E.g., Stella Decl. ¶ 29, Ex. CC, Y Combinator, at 1; Stella Decl. ¶ 30, Ex. DD, Product Hunt Q&A, at 1. Plaintiff stated: "[W]e saw some of our favorite writers were … publishing email exchanges as content on their site. So we built RA to make it easy for you to publish this content (no cutting & pasting long email chains or transcribing …)."
[82] Plaintiff made a cease-and-desist demand regarding Gov. Jeb Bush's book (Stella Decl. ¶ 33, Ex. FF, Aug. 31, 2015 Letter to Plaintiff from Counsel for Gov. Jeb Bush), and filed an unsuccessful Letter of Protest with the USPTO against Ms. Lewis's trademark application—Ms. Lewis's mark has since registered (Stella Decl. ¶ 34, Ex. GG, Pros. History of Ms. Lewis' REPLY ALL Registration). *See also* Stella Decl. ¶ 12, Ex. L, 9/13/16 Pl.'s 30(b)(6)/Abramowitz Tr. at 148:12–165:5, 171:17–179:13.

15

"the source-denoting function" of words used in conjunction with products or services in the marketplace, and not the words themselves.[83]

As the owner of a federal trademark registration for its REPLY ALL Mark for use in connection with its narrative storytelling podcasts, Gimlet Media is accorded by the Lanham Act the presumptive right to use its mark in connection with its podcasts.[84] The Second Circuit has ruled that this presumption extends *in connection with the services specified in the registration certificate*, and no further.[85] Thus, despite Plaintiff's ownership of a federal registration for REPLYALL for its computer software widget, Plaintiff is *not* entitled to claim Lanham Act protection in the field of podcasts. Moreover, even assuming *arguendo* that Plaintiff could establish a likelihood of confusion (which Gimlet strongly denies), there is no chance—in view of Gimlet Media's federal registration and good faith adoption of its mark—that Plaintiff could obtain any monetary relief.

### 1.   Applying The *Polaroid* Factors

In both forward and reverse confusion cases,[86] courts assess likelihood of confusion by a balancing of the *Polaroid* factors, including: (1) the strength of the senior mark; (2) the degree of similarity between the two marks; (3) the proximity of the products; (4) the defendant's good (or bad) faith in adopting its own mark; (5) the likelihood that the prior owner will "bridge the gap"; (6) actual confusion; (7) the quality of defendant's products; and (8) the sophistication of the purchasers.[87] Unlike in forward confusion cases, in reverse confusion cases the relevant

---

[83] *Anti-Monopoly, Inc. v. Gen. Mills Fun Grp.*, 611 F.2d 296, 301 (9th Cir. 1979). Mr. Abramowitz erroneously boasted: "Up until now no one has tried to build a business around the term 'reply all.'" Stella Decl. ¶ 2, Ex. B, Dec. 2, 2014 Audio Recording, at 23:25–24:44.

[84] 15 U.S.C. § 1115(a).

[85] *Savin Corp.*, 391 F.3d at 457 (citing *Mushroom Makers Inc. v. R. G. Barry Corp.*, 580 F.2d 44, 48 (2d Cir. 1978)). *See also Montblanc-Simplo v. Aurora Due S.r.L.*, 363 F.Supp.2d 467, 477 (2d Cir. 2005) (citing 15 U.S.C. § 1057(b)); *King Research, Inc. v. Shulton, Inc.*, 454 F.2d 66, 68–69 (2d Cir. 1972) (SHIP SHAPE mark for hairspray did not infringe registered SHIP SHAPE mark for comb and brush cleaners).

[86] *See M & G Elecs. Sales Corp. v. Sony Kabushiki Kaisha*, 250 F.Supp.2d 91, 100–01 (E.D.N.Y. 2003).

[87] *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961); *accord Streetwise Maps, Inc. v. Vandam, Inc.*, 159 F.3d 739, 743 (2d Cir. 1998).

consumer is the consumer of the *senior* user's services.[88] Additionally, the Second Circuit places particular importance on the commercial strength of the junior mark, measured primarily by the renown of the junior mark, and whether the junior user excessively advertised its services in a bad faith effort to force the senior user from the market.[89] "[Plaintiff's] reverse confusion case is proven *only if* the evidence shows that the junior user [Gimlet Media] was able to swamp the reputation of [Plaintiff] with a relatively *much larger advertising campaign*,"[90] i.e., only if Gimlet Media has "extensively" and "aggressively advertised" its services in bad faith to drive Plaintiff out of the market.[91] In order to succeed on its reverse confusion theory, "[P]laintiff must generally make a showing that [Gimlet Media's] junior mark is extremely well-known, not just that it is more well known than [P]laintiff's senior mark."[92]

The record in this case is devoid of any evidence that Gimlet Media's mark is well known, much less "extremely" well known. The irrefutable evidence demonstrates that Gimlet Media has spent *not a dime* on marketing or advertising its *Reply All* podcast, which evidence precludes the possibility of Gimlet Media's having saturated the market.[93] Because Plaintiff has had this evidence in its possession for more than a year, Plaintiff must know that its newly-minted reverse confusion theory is untenable.[94] Plaintiff's pursuit of a reverse confusion claim is thus manifestly in bad faith, and therefore Gimlet Media will seek its attorneys' fees relating to the same at the appropriate time.

---

[88] *See Sterling Drug, Inc. v. Bayer AG*, 14 F.3d 733, 742 (2d Cir. 1994); *Sunenblick v. Harrell*, 895 F.Supp. 616, 626 (S.D.N.Y. 1995), *aff'd*, 101 F.3d 684 (2d Cir. 1996); *M & G Elecs.*, 250 F.Supp.2d at 106.

[89] *Sunenblick*, 895 F.Supp. at 626; *M & G Elecs.*, 250 F.Supp.2d at 106.

[90] *M & G Elecs.*, 250 F.Supp.2d at 106 (quoting 4 J. Thomas McCarthy, McCarthy on Trademarks & Unfair Competition § 23:10) (emphasis added)).

[91] *Sunenblick*, 895 F.Supp. at 626.

[92] *National Distillers Prods. Co., LLC v. Refreshment Brands, Inc.*, No. 00-8418, 2002 WL 1766548, *2 n.9 (S.D.N.Y. 2002) (comparing *Dreamwerks Prod. Group, Inc. v. SKB Studio*, 142 F.3d 1127, 1128 (9th Cir. 1998)). Whether defendant's sales far exceed plaintiff's is not pertinent to the inquiry. *Id.*

[93] *See supra* note 26.

[94] *M & G Elecs.*, 250 F.Supp.2d at 106 (holding no likelihood of reverse confusion between the mark "M&G" for electronics products and the mark "MG" for a new copyright management technology for digital music because defendant had not aggressively advertised and, without extensive advertising, there was no basis for a reverse confusion theory that the defendant had swamped the market with its mark to the detriment of the plaintiff's mark).

17

Plaintiff's view of reverse confusion is as overly expansive and as unfounded as its view of forward confusion. Plaintiff claims that the reverse confusion theory of liability prevents Gimlet Media—a more successful, junior company—from extensively promoting a similar mark in such a way that Plaintiff's mark is "swallowed up, digested and destroyed for plaintiff's use."[95] However, because the Parties are using their respective marks on entirely different services in completely different fields, and because the balance of other considerations weighs decidedly against a likelihood of confusion—forward or reverse—the law does not give Plaintiff exclusive rights to use REPLYALL as a mark.[96] Granting Plaintiff such rights under the present circumstances "would be tantamount to awarding [Plaintiff] exclusive dominion over the use of the word, and the right to impair other parties' entrance into areas of endeavor far removed from its own. The trademark laws were not designed to serve this purpose."[97]

Plaintiff has proffered no evidence that a single customer or user ever tried to register for its web-based software tool thinking it was a podcast, nor is there any evidence that the reverse has happened. Plaintiff did not take a survey in an attempt to show likelihood of confusion, probably because it knew that the results would be unfavorable. In fact, Plaintiff's principal Mr. Abramowitz was ready and willing to appear on one of Gimlet's podcasts to discuss Plaintiff's fledgling business, and went so far as to suggest that Plaintiff advertise its REPLYALL software on an episode of "the actual *Reply All* podcast"—all while offering a trademark license to Gimlet for the grand sum of $1 annually in perpetuity.[98] Plaintiff's supposed fear of confusion arose only after Gimlet denied Mr. Abramowitz the public platform he so desperately craved on Gimlet's *StartUp* show.

---

[95] *DeClemente v. Columbia Pictures Indus., Inc.*, 860 F.Supp. 30, 51 (E.D.N.Y. 1994) (quoting *W.W.W. Pharm. Co. v. Gillette Co.*, 984 F.2d 567, 576 (2d Cir. 1993)).
[96] *Id.*
[97] *Id.*
[98] Stella Decl. ¶ 2, Ex. B, Dec. 2, 2014 Audio Recording, at 31:06–31:30.

In short, there is simply no likelihood of confusion here. No reasonable consumer of the Parties' respective services could possibly confuse the source of Gimlet Media's narrative storytelling podcast with that of Plaintiff's embeddable computer software widget.

a)      *Plaintiff's Mark Is Weak In Gimlet Media's Podcast Market.*

A plaintiff's mark must be considered weak for purposes of the confusion analysis when plaintiff fails to demonstrate "that its mark [is] strong in the market for *defendant's* services."[99] Here, Plaintiff has offered no evidence that its mark is strong in the market for Gimlet Media's services, namely, podcasts. Although Plaintiff's mark is registered, registration itself proves nothing regarding marketplace strength.

The statutory presumption of an exclusive right to use the mark *extends only so far as the services stated in its registration certificate*.[100] Plaintiff's registration certificate recites its services—narrowly—as "computer services, namely, creating an on-line community for registered users to form groups and create publicly viewable conversations where group members are the only individuals who can contribute to the conversation," while Gimlet Media's registration certificate recites "entertainment services, namely, providing podcasts on the subject of the internet." Plaintiff has not submitted any evidence that its mark is strong in the market for its own services, much less in that for Gimlet Media's. Moreover, Plaintiff has abandoned the services recited in its registration. As Plaintiff's principal testified, "[t]he 'on-line community for registered users' *was* the ReplyAll [web]site …."[101] However, Plaintiff was unable to draw traffic to its website sufficient to sell ad space, thus eliminating the potential to realize one of its

---

[99] *Savin Corp.*, 391 F.3d at 457 (citing *Savin Corp. v. Savin Group*, No. 02cv9377, 2003 WL 22451731 (S.D.N.Y. Oct. 24, 2003)).
[100] 15 U.S.C. § 1115(a); *Savin Corp.*, 391 F.3d at 457 (citing *Mushroom Makers Inc. v. R. G. Barry Corp.*, 580 F.2d 44, 48 (2d Cir. 1978)). A federal trademark registration is prima facie evidence of the validity of a mark and of a registrant's exclusive right to use the mark. *Montblanc-Simplo v. Aurora Due S.r.L.*, 363 F.Supp.2d 467, 477 (2d Cir. 2005) (citing 15 U.S.C. § 1057(b)).
[101] Stella Decl. ¶ 12, Ex. L, 9/13/16 Pl.'s 30(b)(6)/Abramowitz Tr. at 138:10–16 (emphasis added).

three originally proposed revenue streams.[102] Specifically, users of Plaintiff's software were interested in it only for the purpose of publishing content *on their own websites*.[103] Plaintiff thus "pivoted and built a basic publishing tool,"[104] which was launched in or around June 2014—at least five months before Gimlet aired its first *Reply All* episode.[105] A visit to Plaintiff's website confirms no such "on-line community for registered users" exists.[106]

The term "reply all" is not a coined term like KODAK or XEROX—it is a term in common use[107] and readily recognized by anyone who uses email.[108] As discussed above, the "reply all" email command inspired Plaintiff's software and its adoption of the REPLYALL mark[109] and double-arrow logo—as Plaintiff stated, "Obviously, everyone knows where we took it from"[110]—and thus at best it is inherently highly suggestive in the context of Plaintiff's software services. Again, in the context of Gimlet's podcast services, "reply all" has no meaning.

The strength of Plaintiff's inherently weak mark is "seriously diminished" by its utter lack of commercial strength. Specifically, the Second Circuit has held that a mark is weak if its owner spends little or no money on advertising, has a small advertising budget relative to market competitors, and has a low level of commercial success.[111] Here, Plaintiff has spent not one penny on advertising in the five plus years since its launch, and has no advertising budget and no

---

[102] *Id.* at 80:13–83:17; 213:5–19. Plaintiff has failed to realize any of those revenue streams. *Id.* at 207:24–224:8.
[103] *See supra* notes 29–31.
[104] *Id.*
[105] *Id.*.
[106] Stella Decl. ¶ 32.
[107] Google searches for "reply all" return 551,000 results, and for "replyall," 432,000 results. (Stella Decl. ¶ 35.)
[108] *See, e.g.,* Stella Decl. ¶ 2, Ex. B, Dec. 2, 2014 Audio Recording, at 3:20–3:46; Stella Decl. ¶ 36, Ex. HH, Wikipedia, "Reply All," which redirects to "Email Storm."
[109] *See* Stella Decl. ¶ 12, Ex. L, 9/13/16 Pl.'s 30(b)(6)/Abramowitz Tr. at 123:12–124:17; *supra* notes 29–31. Plaintiff's website touts that using its software is "just you and your guest emailing back and forth…." Stella Decl. ¶ 38, Ex. JJ.
[110] Stella Decl. ¶ 2, Ex. B, Dec. 2014 Audio Recording, at 12:06–12:40. Curiously, Plaintiff denied this at deposition. Stella Decl. ¶ 12, Ex. L, 9/13/16 Pl.'s 30(b)(6)/Abramowitz Tr. at 124:22–127:8. As Gimlet noted of the double-arrow symbol: "You name something 'reply all,' you're gonna go with the arrows." *Id.* at 40:40–41:05.
[111] *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 269 F.3d 114, 123 (2d Cir. 2001) (because "[e]ven an inherently distinctive mark can, in its commercial context, lack strength as a mark," plaintiff's mark was weak due to "its low level of commercial success and small advertising budget relative to market competitors"); *Mondo, Inc. v. Sirco Int'l Corp.*, No. 97 Civ. 3121, 1998 WL 849401, at *5–6 (S.D.N.Y. Dec. 7, 1998) (inherent strength of party's arbitrary mark was "seriously diminished" by its lack of commercial strength).

plans for a future advertising budget.[112] Although a few entities have paid to learn how to use its software,[113] Plaintiff has had only negligible sales related to its product,[114] and thus no commercial success.[115] In short, the marketplace strength of Plaintiff's mark is zero.

Ubiquitous third-party use further weakens Plaintiff's mark. Not only does the "reply all" command appear on virtually every email program in the country, but "Reply All" is also a frequent song and book title,[116] e.g., Governor Jeb Bush's e-book title *Reply All: A Governor's Story 1999–2007* (the publication of which Plaintiff tried and failed to block), and is the federally registered trademark of third party individual Donna Lewis (the registration for which Plaintiff tried and failed to block)—which mark Ms. Lewis, like Gimlet Media, uses in connection with "entertainment services."[117] Specifically, Ms. Lewis publishes the *Reply All* online cartoon comic strip, and her use of the mark has priority over Plaintiff's use by 1.5 years.[118] Ms. Lewis' registration and use of REPLY ALL further demonstrates that Plaintiff, with its mark, does not control entertainment content, and that Plaintiff's services are quite distant from Gimlet Media's. Indeed, the USPTO allowed both Ms. Lewis' and Gimlet Media's REPLY ALL applications to proceed to registration without any reference to a possible likelihood of confusion with Plaintiff's already registered mark. Significantly, the Second Circuit has held that USPTO decisions "are entitled to great weight on the issue of likelihood of confusion."[119]

To the extent Plaintiff complains of reverse confusion, as discussed above, the strength of Gimlet's junior mark turns on whether it has aggressively advertised its product (e.g., with

---

[112] *See supra* note 7.

[113] *See supra* note 8.

[114] *See supra* note 9.

[115] *Sunenblick v. Harrell*, 895 F.Supp. 616, 627 (S.D.N.Y. 1995), *aff'd*, 101 F.3d 684 (2d Cir. 1996).

[116] Additional uses of "reply all" include Richie Frieman's audiobook Reply All [And Other Ways to Tank Your Career]; Robin Hemley's e-book Reply All; Calamateur's song "Reply All," and "Outlook - Reply & Reply All, iTunes U Course Materials"—all of which, like Gimlet Media's podcasts and Gov. Bush's book, are available for download/streaming on iTunes. Stella Decl. ¶ 12, Ex. L, 9/13/16 Pl.'s 30(b)(6)/Abramowitz Tr. at 175:22–184:6.

[117] *See supra* note 82.

[118] *See* Stella Decl. ¶ 34, Ex. GG, Pros. History of Ms. Lewis' REPLY ALL Registration (first use date: Feb. 2011).

[119] *M & G Elecs. Sales v. Sony Kabushiki Kaisha*, 250 F.Supp.2d 91, 98–100 (E.D.N.Y. 2003) (citing *Murphy Door Bed Co., Inc. v. Interior Sleep Sys., Inc.*, 874 F.2d 95, 101 (2d Cir. 1989)).

tremendous advertising expenditures) with the bad faith intent to drive Plaintiff out of the market, and whether Gimlet's mark is extremely known.[120] As confirmed by Gimlet Media's financial statements and its testimony, Gimlet Media has spent and continues to spend *nothing* on marketing and advertising its *Reply All* podcast.[121] Rather, Gimlet Media has found success in the podcasting space via organic growth, including strong word-of-mouth of its listeners and fans, critical media acclaim, industry awards, and the stellar reputations in the journalism and podcasting industries of its founders, producers and podcast hosts.[122] Even if Gimlet had spent excessively to advertise its podcast, it could never have done so with a bad faith intent to drive Plaintiff from the market because the Parties' respective markets are wholly distinct. Because Gimlet Media's advertising efforts and expenditures are nil and there is no evidence that its mark is "extremely well known," Plaintiff's last-ditch reverse confusion claim cannot succeed.[123]

In sum, Plaintiff's mark is a weak source indicator, particularly in the narrow field in which it is registered; any presumption of inherent strength that may now be afforded by its registration[124] does not extend to the field of podcasts.[125] As to Plaintiff's assertion of reverse confusion, the lack of Gimlet Media's advertising expenditures and of any evidence that Gimlet's mark is "extremely well known" is alone dispositive. Accordingly, the first *Polaroid* factor, strength of the mark, weighs in favor of Defendant.

---

[120] *M & G Elecs.*, 250 F.Supp.2d at 106 (holding no likelihood of reverse confusion between the mark "M&G" for electronics products and the mark "MG" for a new copyright management technology for digital music because defendant had not aggressively advertised and, without extensive advertising, there was no basis for a reverse confusion theory that the defendant had swamped the market with its mark to the detriment of the plaintiff's mark).
[121] Stella Decl. ¶ 15, Ex. O, Lieber Tr. at 167:24–168:2.
[122] *See supra* note 13; *infra* note 196.
[123] *M & G Elecs.*, 250 F.Supp.2d at 106 (Evidence that larger, junior user was not aggressively advertising allegedly infringing products was sufficient to defeat senior user's reverse confusion theory).
[124] 15 U.S.C. § 1115(a); *Savin Corp. v. Savin Group*, 391 F.3d 439, 457 (2d Cir. 2004) (citing *Mushroom Makers Inc. v. R. G. Barry Corp.*, 580 F.2d 44, 48 (2d Cir. 1978)).
[125] *See Savin Corp.*, 391 F.3d at 457 (citing *Mushroom Makers*, 580 F.2d at 48; *Paco Sport, Ltd. v. Paco Rabanne Parfums*, 86 F.Supp.2d 305, 312 (S.D.N.Y. 2000)).

> ### b)   *Gimlet Media's Mark Is Materially Different From Plaintiff's Mark.*

This factor looks to "whether the similarity of the marks is likely to provoke confusion among *prospective purchasers*."[126] "The test for determining this factor is whether the labels create the 'same overall impression' when viewed separately."[127] "The use of the same words is far from being dispositive." [128] "[A]n inquiry into the degree of similarity between two marks does not end with a comparison of the marks themselves"[129]—"the setting in which a designation is used affects its appearance and colors the impression conveyed by it."[130] Indeed, the "'impression' conveyed by the setting in which the mark is used is often of critical importance."[131] The Second Circuit looks to the overall impression created by a trademark, including the logo, typeface, the size of the logos, and the placement of the marks next to other identifying but dissimilar symbols, when assessing the dissimilarity of the marks.[132] If the marks "are used for different purposes and are presented to the public differently," even if they are visually and aurally identical, "they are dissimilar and no issue of fact is created."[133]

Here, while the textual portions of the parties' marks may overlap, a visual inspection of the marks as used in the marketplace reveals that the overall impression created by each of the marks is highly distinctive. Plaintiff uses the mark in the following form[134]:

---

[126] *DeClemente v. Columbia Pictures Indus., Inc.*, 860 F.Supp. 30, 47 (E.D.N.Y. 1994) (quoting *W.W.W. Pharm. Co. v. Gillette Co.*, 984 F.2d 567, 573 (2d Cir. 1993)).

[127] *M & G Elecs.*, 250 F.Supp.2d at 102–03. *Cf. Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 454 F.3d 108, 117 (2d Cir. 2006) (finding the trial court inappropriately focused on the similarity of the marks in a side-by-side comparison instead of viewing them in the overall context of the marketplace).

[128] *Rush Indus., Inc. v. Garnier LLC*, 496 F.Supp.2d 220, 226 (E.D.N.Y. 2007).

[129] *Savin Corp. v. Savin Group*, 391 F.3d 439, 458 (2d Cir. 2004) (quoting *Spring Mills, Inc. v. Ultracashmere House, Ltd.*, 689 F.2d 1127, 1130 (2d Cir. 1982)).

[130] *Savin Corp.*, 391 F.3d at 458 (citation omitted).

[131] *Savin Corp.*, 391 F.3d at 458 (quoting *Spring Mills*, 689 F.2d at 1130).

[132] *See Hormel Foods Corp. v. Jim Henson Prod., Inc.*, 73 F.3d 497, 503-04 (2d Cir. 1996); *Gruner + Jahr USA Publ'g v. Meredith Corp.*, 991 F.2d 1072, 1078 (2d Cir. 1993).

[133] *DeClemente v. Columbia Pictures Indus., Inc.*, 860 F.Supp. 30, 48 ( E.D.N.Y. 1994) (citing *Lang v. Ret. Living Publ'g Co.*, 949 F.2d 576, 582 (2d Cir. 1991)).

[134] Notably, Plaintiff's double arrows point up and to the right, rather than to the left, as in the universal "reply all" symbol and in Gimlet Media's original logo.



Gimlet Media originally used its mark in the form on the left, below, which includes the universal double-arrow symbol for "reply all," but now uses the mark below, on the right[135]:




Defendant's Old Logo                    Defendant's Current Logo

As shown above, the words, fonts, colors, and overall appearances of the Parties' respective marks differ significantly. Gimlet Media's marks incorporate graphics, colors, symbols, and other words and/or phrases. By contrast, Plaintiff's mark incorporates a dissimilar graphic, font, color, and phrase. Unlike the universal double-arrow symbol for "reply all" used in Gimlet Media's old logo, Plaintiff's double-arrows point up and to the right.

Although the registered portions of the Parties' respective marks "'are composed of the same words and sound the same when uttered,' there [are] significant and fundamental differences between them."[136] Plaintiff's mark is for an embeddable software widget, while Gimlet's mark is for narrative storytelling and journalistic podcasts, and a review of the logos above confirms that "each mark is presented and packaged differently to the public."[137]

---

[135] Gimlet regularly redesigns its website and logos. Stella Decl. ¶ 15, Ex. O, Lieber Tr. at 167:3–169:25. While Gimlet has an online presence, unlike Plaintiff, "[m]ost of [its] audiences aren't on the web. [Its] audiences are on distributed platforms like iTunes and Spotify and so [Gimlet] do[es]n't play too many games to get distribution on the web. … The reason we redesign the website every year with different firms is because the web is not—the web is not where our primary focus is. Our primary focus is on the audio that gets consumed elsewhere." *Id.* at 169:3–25.
[136] *DeClemente*, 860 F.Supp. at 48 (quoting *W.W.W. Pharm. Co. v. Gillette Co.*, 984 F.2d 567, 573 (2d Cir. 1993)).
[137] *DeClemente*, 860 F.Supp. at 48.

Because of the highly dissimilar overall impressions created by the context in which the Parties' respective marks are found, it is readily apparent that the marks, themselves, cannot cause confusion among prospective consumers. Accordingly, the second *Polaroid* factor, similarity of the marks, weighs in favor of Defendant.

### c)       The Parties' Products Are Not In Competitive Proximity.

The proximity factor focuses on whether the Parties' "products compete with each other."[138] Here, no such competition or substitutability exists—and Plaintiff has conceded the same.[139] "In assessing this factor, 'the court may consider whether the products differ in content, geographic distribution, market position, and audience appeal.'"[140] Plaintiff and Gimlet Media operate in wholly distinct product markets and provide entirely different services to different relevant consumers.[141]

Gimlet Media's primary business is "the production and monetization of podcasts."[142] Each episode of the *Reply All* podcast is highly produced and edited, and involves numerous researchers, writers, producers and hosts, who script, write, record, edit and mix each show, often using hundreds of hours of audio recordings to arrive at 25–50 minute episodes that are published for public consumption.[143] An episode typically includes at least one narrator, and the consumer experience is similar to watching a documentary.[144] Gimlet Media's podcasts are available for streaming and download via distribution platforms, e.g., SoundCloud, Spotify and iTunes—the last of which is the source of the majority of Gimlet Media's customers—and by

---

[138] *Savin Corp. v. Savin Group*, 391 F.3d 439, 458 (2d Cir. 2004) (quoting *Lang v. Ret. Living Publ'g Co.*, 949 F.2d 576, 582 (2d Cir. 1991)).
[139] Stella Decl. ¶ 12, Ex. L, 9/13/16 Pl.'s 30(b)(6)/Abramowitz Tr. at 121:10–15; 122:2–12; 203:3–204:13.
[140] *Savin Corp.*, 391 F.3d at 458–59 (quoting *W.W.W. Pharm.*, 984 F.2d at 573; *see, e.g., Arrow Fastener Co. v. Stanley Works*, 59 F.3d 384, 396 (2d Cir. 1995) (holding that customers were not likely to be confused when both parties sold staplers in same stores, but one party sold a pneumatic stapler and the other a lightweight small stapler)).
[141] *Cf. Sunenblick v. Harrell*, 895 F.Supp. 616, 627 (S.D.N.Y. 1995), *aff'd*, 101 F.3d 684 (2d Cir. 1996)  (finding no confusion between jazz records and hip-hop records sold under the identical mark UPTOWN RECORDS because the parties' recordings were marketed to different consumers and sold in separate sections of record stores).
[142] Stella Decl. ¶ 20, Ex. T, Grau Tr. at 17:21–18:2.
[143] Stella Decl. ¶ 15, Ex. O, Lieber Tr. 47:3–8; 73:12–74:10; 89:7–90:13.
[144] *Id.* at 90:2–13.

25

subscription service.[145] Gimlet's services, unlike Plaintiff's, are not web-based and thus do not require a web browser or visit to a webpage, but require only a passive connection to the internet. Gimlet Media's consumers need only plug in their earbuds and hit play to consume audio entertainment, i.e., the *Reply All* podcast, on the go, including in the car, at the gym, and in other computer- and web-free environments. By contrast, the *sole* access channel to Plaintiff's software is via its website portal. Its users are thus required to visit the world wide web in order to access and use the software.

Plaintiff's web-based embeddable software widget may be used by consumers to publish group-email-style, text-based content on a webpage in "chat bubbles." Such consumers cannot obtain this result, or anything like it, from Gimlet Media's narrative storytelling podcasts. Similarly, consumers wanting to listen to a podcast about "the internet and trained rats, time travel, celebrity dogs, lovelorn phone scammers, angry flower children, workplace iguanas, and more," cannot have their needs met by Plaintiff's computer software product.[146] The lack of proximity between Plaintiff's and Gimlet Media's products was confirmed by the USPTO when Gimlet's registration for the mark REPLY ALL for "entertainment services, namely, providing podcasts on the subject of the internet," was issued despite the existence of Plaintiff's registration for the mark REPLYALL for "computer services, namely, creating an on-line community for registered users to form groups and create publicly viewable conversations where group members are the only individuals who can contribute to the conversation."[147] In examining Gimlet's application to register, the USPTO must have concluded that these services and product markets are sufficiently distinct and non-overlapping such that both marks could be registered. Indeed, the USPTO made no reference whatsoever to Plaintiff's registration during its

---

[145] *See supra* note 19.
[146] *See* Stella Decl. ¶ 18, Ex. R, Feld Tr. at 41:7–11. (Q: "If you were looking from something to listen to, would [Plaintiff's] ReplyAll computer services platform be one of your options?" A: "No.").
[147] The prosecution history of Gimlet Media's REPLY ALL registration confirms that the Examining Attorney considered and dismissed Plaintiff's (and Ms. Lewis') registration as irrelevant (i.e., no Office Action issued). *See* Stella Decl. ¶ 1, Ex. A, Pros. History of Gimlet Media's REPLY ALL Registration.

examination of Gimlet Media's REPLY ALL application.[148] Significantly, the Second Circuit has held that PTO decisions on likelihood of confusion are "to be accorded great weight."[149]

In an effort to feign some proximity between the products of the Parties, Plaintiff at every turn has disingenuously attributed to itself the services, trade channels and relevant consumers of Gimlet Media and those of *some of Plaintiff's own users*. For example, Plaintiff argues that "advertisers who purchase advertising time on Gimlet podcasts may alternatively consider purchasing advertising time on websites such as Above the Law in conjunction with its use of the ReplyAll technology owned by [Plaintiff]."[150] However, advertisers purchasing ads on AbovetheLaw.com are *Above the Law's* advertisers—*not* Plaintiff's. In truth, Plaintiff has no advertisers, has not sought advertisers, and collects no advertising revenues.[151] One who reads content on AbovetheLaw.com, even if that content is a conversation embedded on the site using Plaintiff's software, does not visit AbovetheLaw.com to read <u>Plaintiff's</u> content—that reader is consuming *Above the Law's* content.[152] It is the user of Plaintiff's software—not the software, itself—that creates the content that may then be published with Plaintiff's software tool. As Plaintiff's own website touts, "[W]e built ReplyAll to make it easy for *you* to host experts and interesting people for interviews, debates and fireside chats. … *We've built ReplyAll for you, the content creator*."[153] Plaintiff is no more a content creator than is the Microsoft® Word software program on which this memorandum is written.

Even more, Plaintiff's statement above is just wrong—advertisers who purchase "advertising *time*" on Gimlet's podcast cannot purchase such *time* on a website like AbovetheLaw.com. Gimlet Media's advertising services are exceptionally unique and not

---

[148] *See id.*
[149] *M & G Elecs. Sales v. Sony Kabushiki Kaisha*, 250 F.Supp.2d 91, 98–100 (E.D.N.Y. 2003) (citing *Murphy Door Bed Co., Inc. v. Interior Sleep Sys., Inc.*, 874 F.2d 95, 101 (2d Cir. 1989)).
[150] Stella Decl. ¶ 37, Ex. II, Excerpt from Pl.'s Expert Report of Professor Marc Edelman, at 17.
[151] Stella Decl. ¶ 12, Ex. L, 9/13/2016 Pl.'s 30(b)(6)/Abramowitz Tr. at 213:5–19.
[152] *Id.* at 188:12–14; 200:5–201:12; Stella Decl. ¶ 7, Ex. G, 10/20/17 Pl.'s 30(b)(6) Tr. at 73:2–7.
[153] Stella Decl. ¶ 38, Ex. JJ, "About" Section of Plaintiff's website (emphasis added).

adaptable for the web or for any print media. Specifically, ads purchased from Gimlet Media are audio ads that may run several minutes and are (1) written and produced by Gimlet Media, (2) scored with "ad music," and (3) spoken by the hosts of the podcast during which the ads air (and in some instances by Gimlet President Matt Lieber[154]).[155] Gimlet's highly customized audio cannot be compared to a banner ad posted on the AbovetheLaw.com website.

Finally—and compellingly—prior to this litigation, Plaintiff identified its competitors or "rival sites" as other providers of software that may be used to publish content on the web, e.g., Grantland, Convore, CoveritLive, Twitter, Branch, and Public.chat.[156] Only after Plaintiff initiated its dispute with Gimlet Media did it claim that its software competes with Gimlet Media's podcasts.

Plaintiff's product is technology—nothing more than an embeddable web-based software tool that may be used to publish text-based content on a webpage, in chat bubbles. Plaintiff's efforts to conflate itself with some of its own and Gimlet's users are transparently bogus and must be ignored. Accordingly, the third *Polaroid* factor, proximity of the Parties' services, weighs in favor of Defendant.

### d)      *Gimlet Media Adopted Its Mark In Good Faith.*

The good-faith factor "considers whether the defendant adopted its mark with the intention of capitalizing on [the] plaintiff's reputation and goodwill and [on] any confusion between his and the senior user's product."[157] As an initial matter, "Plaintiff, as a startup, had no reputation or goodwill for defendant to capitalize on."[158] In any event, Gimlet's adoption and use

---

[154] Stella Decl. ¶ 39, Ex. KK, *Reply All* Podcast, Ep. No. 36, "Today's the Day" (at 30:08–30:45).
[155] Stella Decl. ¶ 15, Ex. O, Lieber Tr. at 67:12–68:9; Stella Decl. ¶ 20, Ex. T, Grau Tr. at 25:12–18; 27:23–28:18. *See id.* at 0:00–0:53; 30:08–30:45; Stella Decl. ¶ 40, Ex. LL, *Reply All* Ep. No. 79, "Boy in Photo," at 26:10–27:28.
[156] Stella Decl. ¶ 28, Ex. BB, Pl.'s 2012 Business Plan, at 124–27; Stella Decl. ¶ 18, Ex. R, Feld Tr. at 67:24–68:12; Stella Decl. ¶ 12, Ex. L, 9/13/16 Pl.'s 30(b)(6)/Abramowitz Tr. at 201:23–202:22; 299:17–305:9.
[157] *See Savin Corp.*, 391 F.3d at 460 (quoting *W.W.W. Pharm. Co. v. Gillette Co.*, 984 F.2d 567, 575 (2d Cir. 1993)).
[158] *ImOn, Inc. v. ImaginOn, Inc.*, 90 F.Supp.2d 345, 353 (S.D.N.Y. 2000).

of the mark REPLY ALL was in good faith, after seeking advice of counsel.[159] (Plaintiff testified

it obtained opinion of counsel after initiating the instant suit, which opinion it has declined to

produce in this case.[160]) Moreover, despite the existence of Plaintiff's registration, the USPTO

issued to Gimlet its own federal registration for the mark REPLY ALL for its podcast services.

How can a party who owns a federal registration for its mark be in bad faith for using the mark

for the services recited in the registration? Simple answer—it cannot.

       Gimlet Media had no inkling whatsoever that it might be infringing another's mark.

Gimlet did not copy the mark from another entity. In fact, Gimlet Media was not even aware of

Plaintiff's existence at the time it selected the REPLY ALL Mark,[161] and arrived at the name

independently. In Fall 2014, Gimlet Media "had a number of structured brainstorms" with

podcast hosts PJ Vogt and Alex Goldman about what to name their new podcast, and the hosts

wanted a name that, like its previous podcast show, *TLDR*, had a connection to the internet.[162]

Gimlet Media has produced in this case the notes (containing 27 podcast name options) taken by

Mr. Goldman's wife during the November 2014 brainstorming session during which Gimlet

Media arrived at the name *Reply All*.[163]

       Mr. Lieber subsequently searched the USPTO website, discovered that Plaintiff's mark

was registered only for software (and that third party Donna Lewis' REPLY ALL registration

was only for online comics), determined that Plaintiff's software (and Ms. Lewis' online comic

strip) was unrelated to Gimlet Media's entertainment services, and thus had no reason to believe

---

[159] Stella Decl. ¶ 15, Ex. O, Lieber Tr. at 120:18–123:18. Performing a trademark search and reliance on advice of counsel are factors that support finding of good faith in adopting mark. *Lang v. Ret. Living Publ'g Co.*, 949 F.2d 576 (2d Cir. 1991) (citing Lanham Act, §§ 43(a), 45, as amended, 15 U.S.C.A. §§ 1125(a), 1127).
[160] Stella Decl. ¶ 12, Ex. L, 9/13/16 Pl.'s 30(b)(6)/Abramowitz Tr. at 293:5–294:17.
[161] Even if Gimlet Media had known about Plaintiff's mark prior to selecting it, "[p]rior knowledge of a senior user's trade mark" is not inconsistent with good faith. *See Savin Corp.*, 391 F.3d at 460 (quoting *Arrow Fastener Co. v. Stanley Works*, 59 F.3d 384, 397 (2d Cir. 1995)).
[162] Stella Decl. ¶ 15, Ex. O, Lieber Tr. at 79:17–84:7.
[163] *Id.*; Stella Decl. ¶ 23, Ex. W, Copy of Notebook Page of Gimlet CEO's Wife from Brainstorming Session.

that using the same name for its podcast show would infringe Plaintiff's (or Ms. Lewis') mark.[164] Mr. Lieber's conclusion was subsequently confirmed not only by counsel, but also by the USPTO when, on September 22, 2015, Gimlet Media's REPLY ALL mark registered, without any reference to Plaintiff's (or to Ms. Lewis') registration.[165] Gimlet Media has been using the REPLY ALL mark since at least as early as November 6, 2014.

Gimlet has at all times believed it has the right to use its REPLY ALL mark for its podcast services. That belief was ratified by the USPTO's approval of its application to register the mark. Plaintiff did not oppose Gimlet's application when it was published for opposition by the USPTO. Only after Mr. Abramowitz's podcast appearance was squelched, did Plaintiff go after Gimlet. Thus, the sixth factor, Gimlet Media's good faith, weighs in favor of Defendant.

### e) *There Is No Evidence of Plaintiff's Bridging of the Gap.*

In this case, the question of whether Plaintiff will bridge the gap turns on the likelihood that Plaintiff will enter the market for entertainment services relating to the podcasting industry.[166] Plaintiff has neither claimed nor proffered evidence of any intent to provide entertainment services, namely, podcasts, and certainly has no intent to produce journalistic storytelling podcasts like those of Gimlet Media. To the contrary, Plaintiff's principal testified he is not a podcaster, does not publish podcasts, and is "certainly not" a journalist.[167] As Mr. Abramowitz stated, "In fact, I have even written that many times on the web that I'm not a journalist."[168] Plaintiff's sole product is a software publishing tool, and Plaintiff has continually referred to that software product as "technology."[169]

---

[164] *Savin Corp.*, 391 F.3d at 460 (citing *Savin Corp. v. Savin Group*, 02Civ9377, 2003 WL 22451731, at *11 (S.D.N.Y. Oct. 24, 2003)).
[165] Stella Decl. ¶ 15, Ex. O, Lieber Tr. 120:18–123:18. *See supra* note 1.
[166] *Savin Corp. v. Savin Group*, 391 F.3d 439, 459–60 (2d Cir. 2004) (citing *W.W.W. Pharm. Co. v. Gillette Co.*, 984 F.2d 567, 574 (2d Cir. 1993)).
[167] Stella Decl. ¶ 7, Ex. G, 10/20/17 Pl.'s 30(b)(6) Tr. at 42:6–14.
[168] *Id.*
[169] D.I. 71, at 3 ¶ 9. Plaintiff stated: "Since February 29, 2012, and at all times relevant to this action, [Plaintiff] has used the Mark *to refer to a technology*…." (emphasis added).

Because the record is clear that Plaintiff has never produced a podcast, nor expressed any intent to do so, the fourth *Polaroid* factor, bridging the gap, weighs in favor of Gimlet Media.

*f)*     *Plaintiff's Purported Evidence of Actual Confusion*
            *Is Not Consumer Confusion.*

"The Lanham Act seeks to prevent consumer confusion that enables a seller to pass 'off his goods as the goods of another.' … The relevant confusion is that which affects 'the purchasing and selling of the goods or services in question.'"[170] Evidence of actual confusion must "involve purchasers or prospective purchasers."[171]

Plaintiff's purported evidence of actual confusion consists entirely of testimony by a single interested witness—Plaintiff's CEO Mr. Abramowitz, recounting a handful of anecdotes, including a number of hearsay statements—and of copies of a handful of internet comments posted primarily by Mr. Abramowitz, his personal friends and family, and unidentified and unidentifiable declarants. However, "[t]estimony by several interested witnesses recounting a handful of anecdotes and hearsay statements by unidentified declarants is not evidence of actual confusion."[172] Furthermore, "[t]rademark law is skeptical of the ability of an associate of a trademark holder to transcend personal biases …."[173] "'Attestations from person in close association and intimate contact with (the trademark claimant's) business do not reflect the views of the purchasing public.'"[174] Plaintiff's alleged instances of actual confusion are not confusion at all and certainly are not the type of interaction against which the Lanham Act was designed to protect.[175] Here, the supposed incidents of actual confusion are minimal at most, and even then, highly dubious.

---

[170] *Lang v. Ret. Living Publ'g Co.*, 949 F.2d 576, 582–83 (2d Cir. 1991) (citations omitted).
[171] *Id.* at 583.
[172] *Star Indus. v. Bacardi & Co.*, 412 F.3d 373, 388 (2d Cir. 2005).
[173] *Self-Realization Fellowship Church v. Ananda Church of Self-Realization*, 59 F.3d 902, 910 (9th Cir. 1995).
[174] *Id.* (internal citations omitted).
[175] *Star Indus.*, 412 F.3d 373 at 388.

Despite Gimlet Media's repeated requests that he not do so until after a settlement was reached, Plaintiff's CEO Mr. Abramowitz insisted on publishing online the Parties' pre-litigation settlement negotiation emails between Plaintiff, Gimlet Media, and Gimlet's prior counsel. Plaintiff copied the text of the Parties' emails and used its REPLYALL software to publish those emails on its website.[176] Mr. Abramowitz has also repeatedly accused Gimlet Media of infringement, via social media and other websites,[177] thus inviting the web universe to opine on the matter. Plaintiff subsequently produced in this case, as purported evidence of actual confusion, commentary and mis-tagged social media posts from some of those very same websites. After being pressed by Gimlet Media for months to produce contact information for those individuals whom Plaintiff claims were confused, Plaintiff conceded it had no such information and indeed had never been in contact with any of them.[178] Plaintiff ultimately produced contact information for a single allegedly confused individual, and promised to also produce his affidavit.[179] No such affidavit ever materialized.

Astonishingly, when confronted with evidence from Mr. Abramowitz's personal Facebook account, Plaintiff conceded during its October 20, 2017 deposition that *at least 14 of the individuals cited in Plaintiff's alleged instances of actual consumer confusion are personal friends and family members of Mr. Abramowitz*. Gimlet Media is thus confounded by Plaintiff's repeated insistence and written confirmation that it had no contact information for any of the allegedly confused individuals. Such a revelation calls into question whether Plaintiff actually manufactured the remaining alleged instances of actual confusion.

---

[176] See Stella Decl. ¶¶ 4–6, Ex. D-F, Parties' Dec. 2–18, 2014 Email Negotiations, and Stella Decl. ¶ 31, Ex. EE, Mr. Abramowitz Publishes Parties' Settlement Negotiations on Pl.'s Website.
[177] *See, e.g.*, Stella Decl. ¶ 29, Ex. CC, Y Combinator, at 2; Stella Decl. ¶ 30, Ex. DD, Product Hunt Q&A, at 3.
[178] Stella Decl. ¶ 41, Ex. MM, August 15, 2016 Email from Pl.'s Counsel Confirming it Has Only a Single Contact re: Purported Confusion; Stella Decl. ¶ 42, Ex. NN, August 17, 2016 Letter from Counsel, at 2, promising statement from allegedly confused individual, and confirming no additional relevant contact information.
[179] *Id.*

Furthermore, Plaintiff has provided no evidence of direct consumer testimonials or survey evidence, which absence weighs against a finding of consumer confusion.[180] Where a plaintiff provides no testimony by any consumer who intended to buy plaintiff's product but mistakenly bought defendant's product because of confusion, such absence of evidence weighs heavily against confusion.[181]

In sum, none of Plaintiff's purported evidence of actual confusion holds any water. Inquiries about the relationship between an owner of a mark and an alleged infringer do not amount to actual confusion. Indeed, such inquiries are arguably premised upon a *lack* of confusion between the products such as to inspire the inquiry itself.[182] The same applies to mis-tagged social media posts and to misdirected emails—the Courts of Appeals have held that even 400 misdirected phone calls and 19 misdirected letters are not evidence of consumer confusion.[183] Misdirected communications are not evidence that a purchasing decision is at stake or that there is "a significant risk to the sales, goodwill, or reputation of the trademark owner."[184]

During the more than three years of concurrent use of the Parties' marks, all Plaintiff can show are a handful of social media mis-tags and scattered, cryptic messages from friends and family of Plaintiff's CEO and from unknown, unidentifiable individuals. Even in the unlikely

---

[180] *See Merriam–Webster, Inc. v. Random House, Inc.*, 35 F.3d 65, 72 (2d Cir. 1994); *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 269 F.3d 114, 124 (2d Cir. 2001).

[181] *Merriam-Webster*, 35 F.3d at 72 (finding no actual confusion affecting purchasers, even though plaintiff's and defendant's products were shelved side-by-side at bookstores, because there was no testimony by any consumer, retail or wholesale, who intended to buy plaintiff's dictionary but mistakenly bought defendant's dictionary).

[182] *Nora Beverages*, 269 F.3d at 124 (lack of direct consumer testimonials and survey evidence weighs against actual confusion) (citing *Gruner + Jahr USA Publ'g v. Meredith Corp.*, 793 F.Supp. 1222, 1232 (S.D.N.Y. 1992), *aff'd* 991 F.2d 1072 (2d Cir. 1993)).

[183] *Lang v. Ret. Living Publ'g Co.*, 949 F.2d 576, 582–83 (2d Cir. 1991) ("[T]here is no reason to believe that confusion represented by [misdirected] phone calls [or email] could inflict commercial injury in the form of either a diversion of sales, damage to goodwill, or loss of control over reputation."). *Id.*

[184] *See id.*; *Uber Promotions, Inc. v. Uber Techs., Inc.*, 162 F.Supp.3d 1253, 1272 (N.D. Fla. 2016) (quoting *Dorpan, S.L. v. Hotel Meliá, Inc.*, 728 F.3d 55, 63–64 (1st Cir. 2013); *Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 636 (6th Cir. 2002) (holding that misdirected consumer emails were more likely to indicate that consumers "were inattentive or careless when attempting to find the e-mail address for [defendant] rather than confused about the source of the [product].")

event any purported instance could be construed as actual confusion, Plaintiff has failed to demonstrate commercial injury in the form of either a diversion of sales, damage to goodwill, or loss of control over reputation. Thus, the fifth factor, evidence of actual confusion, weighs in favor of Gimlet Media.

g)    *Both Plaintiff and Gimlet Media Market to Sophisticated Consumers.*

Where the two marks at issue "have contrasting images and different marketing styles, the sophistication of the marks' customers is entitled to some weight."[185] "Generally, the more sophisticated and careful the average consumer of a product is, the less likely it is that similarities in trade dress or trade marks [*sic*] will result in confusion concerning the source of sponsorship of the product."[186] "In considering this factor, the Court looks at the general impression of the ordinary purchaser, buying under normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of [services]."[187]

As discussed in detail, above (in Sections II(A)(1)(b) and (c)), the Parties' marks as used in the marketplace are starkly dissimilar, and their products are entirely unrelated. Consumers purchase (or use) each product for entirely different purposes: Gimlet Media's podcast for audio entertainment (a passive listening experience), and Plaintiff's software for a means to embed text-based content online on a website in chat bubbles (an interactive web-based user experience during which the software user is the content creator).[188]

---

[185] *DeClemente v. Columbia Pictures Indus., Inc.*, 860 F.Supp. 30, 50 (E.D.N.Y. 1994) (citing *Plus Products v. Plus Discount Foods, Inc.*, 722 F.2d 999, 1007 (2d Cir. 1983)).

[186] *Grout Shield Distribs., LLC v. Elio E. Salvo, Inc.*, 824 F.Supp.2d 389, 418 (E.D.N.Y. 2011) (quoting *Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*, 973 F.2d 1033, 1046 (2d Cir. 1992)).

[187] *DeClemente*, 860 F.Supp. at 50 (citing *W.W.W. Pharm. Co. v. Gillette Co.*, 984 F.2d 567, 575 (2d Cir. 1993)).

[188] To the extent Gimlet's relevant consumer is advertisers, "[t]here is little question that major corporations and advertising agencies are extremely sophisticated and are therefore quite capable of distinguishing between" Gimlet Media's podcast and Plaintiff's software. *Parenting Unlimited Inc. v. Columbia Pictures Television Inc.*, 743 F.Supp. 221, 229 (S.D.N.Y. 1990) (citing *Inc. Publ'g Corp. v. Manhattan Magazine, Inc.*, 616 F.Supp. 370, 386–87 (S.D.N.Y. 1985), *aff'd*, 788 F.2d 3 (2d Cir. 1986) "An advertising executive purchasing advertising space is not an impulse buyer and is unlikely to be confused as to the publication in which he is placing an ad," *Parenting Unlimited*, 743 F.Supp. at 229 (citing *Vision, Inc. v. Parks*, 610 F.Supp. 927, 932 (S.D.N.Y. 1985)).

Common sense dictates that consumers will not confuse trademarks as the amount of time associated with the purchase increases.[189] Thus, sophisticated consumers that invest substantial amounts of time in the purchase or consumption of the parties' products cannot confuse the parties' marks. Although Plaintiff does not charge for use of its computer software platform, access to the software requires a number of deliberate steps. A user must visit Plaintiff's website, register to create an account, verify his registration, and log in via the website.[190] After all those steps, a user may then invite via email another individual to use the software to create and embed into a webpage text-based conversations—but only after that invitee steps through the same registration and account verification process.[191]

Consumers of Gimlet Media's *Reply All* podcast have endless options for entertainment, including movies, TV shows, books, the radio, and podcasts—more than 200,000 in the U.S. alone, as of June 2015.[192] Consumers cannot tune into a podcast channel and listen to an endless stream of podcasts—they must research their options, or learn of a podcast through word-of-mouth, in the news, or from prior familiarity with podcast producers or hosts—a built-in audience, as in Gimlet Media's case. Listeners may consume podcasts, whether streamed or downloaded, on the go, including in the car, at the gym, and in other web- and computer-free environments. Consumers who are savvy enough to navigate Plaintiff's website and its multistep registration process, create text-based content, and use Plaintiff's software to embed that content on a webpage, are sophisticated enough to recognize the difference between such software, which may only be accessed via interactive website, and a passive podcast listening experience.

---

[189] *See Haven Capital Mgmt., Inc. v. Havens Advisors, LLC*, 965 F.Supp.528, 534 (S.D.N.Y. 1997), *aff'd*, 159 F.3d 1346 (2d Cir. 1998) (no possible confusion between two competing, similarly-names investment houses).
[190] Stella Decl. ¶ 12, Ex. L, 9/13/16 Pl.'s 30(b)(6)/Abramowitz Tr. at 86:13–92:15.
[191] *Id.*
[192] Stella Decl. ¶ 43, Ex. OO, Josh Morgan, *How Podcasts Have Changed in Ten Years: By the Numbers*, MEDIUM, Sept. 2, 2015.

Because of the time investment and deliberate steps a consumer must take to obtain or consume either Party's product, a consumer will know with whom he or she is dealing. Thus, the seventh factor, sophistication of the relevant consumers, weighs in favor of Defendant.

### h) Plaintiff Agrees That Gimlet Media Produces High Quality Podcasts.

"This factor is primarily concerned with whether the senior user's reputation could be jeopardized by virtue of the fact that the junior user's product is of inferior quality."[193] "[T]he dissimilarity between the [services] as well as between the groups of consumers that each party targets substantially lessens the likelihood of consumers' misapprehending the source of either type of products."[194]

Here, the Parties' services are entirely unrelated, and Plaintiff does not dispute that Gimlet Media's *Reply All* podcast is of high quality. To the contrary, Plaintiff's CEO Mr. Abramowitz has heaped tremendous praise on Gimlet and its podcasts, declaring during the Parties' recorded negotiations, e.g., "I love what you're building," "I'm a huge podcast fan," "I'm obsessed," "I think what you guys are doing is great," and, "You guys are like the Madonna of unique storytelling media."[195] Gimlet's *Reply All* podcast has received critical acclaim from the likes of *This American Life* host Ira Glass, and was a 2016 Webby Award Nominee for Best Podcast.[196] As described in detail (in Section II(A)(1)(c)), above, Gimlet Media's podcast is highly produced and involves countless hours of preparation, research, writing, recording, and

---

[193] *Arrow Fastener Co. v. Stanley Works*, 59 F.3d 384, 398 (2d Cir. 1995).

[194] *Plus Products v. Plus Discount Foods, Inc.*, 722 F.2d 999, 1007 (2d Cir. 1983) (citing *Vitarroz Corp. v. Borden, Inc.*, 644 F.2d 960, 967 (2d Cir. 1981); *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 262 (5th Cir. 1980), *cert. denied*, 449 U.S. 899 (1980).

[195] Stella Decl. ¶ 2, Ex. B, Dec. 2014 Audio Recording, at 6:45–9:30; 14:22–14:31: 38:48–39:15. At deposition, Mr. Abramowitz contradicted himself, testifying he never made this statement, nor had he ever listened to a *Reply All* podcast and "ha[s] no interest in listening to Gimlet Media's *Reply All* podcasts." Stella Decl. ¶ 12, Ex. L, 9/13/16 Pl.'s 30(b)(6)/Abramowitz Tr. at 272:8–273:15.

[196] *See, e.g.*, Stella Decl. ¶ 16, Ex. P, LinkedIn, "Alex Blumberg"; Stella Decl. ¶ 44, Ex. PP, Adam Callinan, *4 Podcasts I Live By*, ENTREPRENEUR, June 2, 2015; Stella Decl. ¶ 45, Ex. QQ, Violet Henderson, *In Praise of the Podcast*, VOGUE, March 24, 2016; Stella Decl. ¶ 46, Ex. RR, Gimlet Media Named 2015 Top 10 Most Innovative Media Cos. in World; Stella Decl. ¶ 47, Ex. SS, Kathryn Bromwich, *On my radar: Ira Glass's cultural highlights*, THE GUARDIAN, August 7, 2016; Stella Decl. ¶ 48, Ex. TT, Farhad Manjoo, *Podcasting Blossoms, but in Slow Motion*, THE NEW YORK TIMES, June 17, 2015; Stella Decl. ¶ 49, Ex. UU, *Reply All*, 2016 Nominee, Best Podcast.

editing, often beginning with hundreds of hours of recordings that are whittled down to a single episode.

The record is clear that Gimlet's services are of exceptionally high quality, and suggests that Plaintiff's services are of decidedly lower quality. Thus, the eighth factor, quality of Defendant's product, weighs in favor of Defendant.

*   *   *   *   *   *

The balancing of the *Polaroid* factors, above, weighs heavily in Gimlet Media's favor and clearly indicates that there is no likelihood of confusion between the Parties' marks. Plaintiff's mark is weak and entitled to only a narrow scope of protection in the software space, which protection cannot extend to Gimlet Media's use in the podcast market. The USPTO's approval of Gimlet Media's trademark application for REPLY ALL, Plaintiff's offer of a $1 per year license, and the eagerness of Plaintiff's CEO to appear on Gimlet's podcast, all confirm the absence of any potential confusion between the Parties' respective marks, and Plaintiff has been unable to offer any viable evidence of actual consumer confusion even after more than three years of coexistence of the marks. In view of the factors discussed above, it is clear that no reasonable juror could find that the name of Gimlet Media's *Reply All* podcast is likely to cause source confusion with Plaintiff's embeddable software widget. Gimlet Media is accordingly entitled to summary judgment on all of Plaintiff's claims.

### B.   Gimlet Media Is Entitled to Summary Judgment That Neither Damages Nor Injunctive Relief Is Available to Plaintiff.

Because Gimlet Media is not liable for infringement, there is no basis for an award of damages in this case. Moreover, even assuming *arguendo* that Plaintiff could establish infringement, summary judgment should be granted on the issue of damages because no reasonable jury could find that Plaintiff is entitled to the award it seeks, namely, Gimlet Media's profits or, alternatively, a reasonable royalty. In order to prevail on its damages claim, Plaintiff must show not only that Gimlet Media infringed Plaintiff's mark, but also that Gimlet acted

deceptively or in bad faith in doing so, and that Plaintiff has sustained pecuniary loss as a result of the infringement. Plaintiff cannot succeed on its claims as a matter of law.

As an initial matter, there is no case law involving an award of damages in a situation where, like here, both parties own federal registrations for their respective marks, because monetary damages are not available in such a case. Indeed, a plaintiff is not entitled to a monetary award when the defendant acted with a good faith belief in its right to use the mark.[197] There is no clearer evidence of Gimlet's good faith belief than its ownership of a federal registration—issued by the USPTO despite the existence of Plaintiff's registration—which grants Gimlet the statutory presumption of the right to use its REPLY ALL mark in connection with its podcasts.

Despite Plaintiff's claim that Gimlet Media's use of *Reply All* as a podcast title is responsible for Plaintiff's failure, Plaintiff has not and cannot offer any proof of lost sales or damage to the economic value of its mark resulting from Gimlet Media's lawful use of its federally registered REPLY ALL Mark. Plaintiff has neither placed any value on its mark, nor attempted to quantify any damages. In fact, Plaintiff has testified it cannot name a single investor or customer lost.[198] Even after the Court ordered Plaintiff to "supplement [] its production regarding damages, including markets for which plaintiff lost opportunities, lost revenue,"[199] Plaintiff produced nothing. It has not even produced standard financial statements in this case, but rather provided only a handful of invoices and cancelled checks. Because Plaintiff has presented no evidence of lost sales or actual damages, monetary recovery is not available.[200]

---

[197] *Romag Fasteners, Inc. v. Fossil, Inc.*, 817 F.3d 782, 785–91 (Fed. Cir. 2016), *cert. granted, judgment vacated*, 137 S. Ct. 1373 (2017), *opinion reinstated in relevant part*, 686 Fed. Appx. 889 (Fed. Cir. 2017) (citing *George Basch Co. v. Blue Coral, Inc.*, 968 F.2d 1532, 1537–41 (2d Cir. 1992)); *DeClemente v. Columbia Pictures Indus., Inc.*, 860 F.Supp. 30, 53 (E.D.N.Y. 1994); *Life Indus. Corp. v. Ocean Bio-Chem, Inc.*, 827 F.Supp. 926, 933 (E.D.N.Y. 1993).
[198] *See supra* note 66.
[199] *See* August 26, 2016 Minute Order for Motion Hearing.
[200] *Romag Fasteners*, 817 F.3d at 786 (citing *George Basch*, 968 F.2d 1532 at 1540–41; *DeClemente*, 860 F.Supp. at 53–54; *Life Indus.*, 827 F.Supp. at 933).

### 1.      __Plaintiff Is Not Entitled To Gimlet Media's Profits.__[201]

In the Second Circuit, willfulness is a prerequisite for disgorgement of a defendant's

profits, although a finding of willfulness does not mandate disgorgement—it is merely a

threshold finding.[202] Accordingly, Plaintiff not only must prove that Gimlet "acted with willful

deception," but also must establish a "basis for finding damage," i.e., that "[Gimlet]'s sales 'were

attributable to its infringing use' of [P]laintiff's mark, *and* that the "infringing use was at

[P]laintiff's expense."[203] In other words, Gimlet is accountable for its profits only if Plaintiff can

show that, but for Gimlet's alleged infringement, Gimlet's sales would have gone to Plaintiff.[204]

As discussed in detail in Section IV(A)(1)(d) above, Gimlet adopted its mark in good

faith, without knowledge of Plaintiff or its software, and after seeking advice of counsel.

Gimlet's good faith belief was confirmed by the USPTO when it issued Gimlet's registration

despite the existence of Plaintiff's registration. Additionally, Plaintiff has offered no evidence

(1) that it lost sales or suffered any damage to the economic value of its mark, (2) that Gimlet's

sales "were attributable to its" use of the REPLY ALL mark,[205] or (3) that such use was at

Plaintiff's expense. Accordingly, Plaintiff's demand for an accounting of Gimlet's profits must

be denied.

### 2.      __Plaintiff Is Not Entitled To A Reasonable Royalty.__

As a threshold matter, absent evidence of actual damages, Plaintiff is not entitled to a

reasonable royalty.[206] Even if Plaintiff could prove damages, a royalty is a seldom-used method

for computing trademark infringement damages that is generally limited to situations where the

---

[201] Under Plaintiff's reverse confusion theory, the alleged infringer's profits is not a proper basis for recovery. 4 McCarthy on Trademarks and Unfair Competition § 23:10 (5th ed. 2017) (citing *Johnny Blastoff, Inc. v. Los Angeles Rams Football Co.*, 188 F.3d 427, 436 (7th Cir. 1999)).

[202] *Romag Fasteners*, 817 F.3d at 786, 789–91 (citing *George Basch*, 968 F.2d at 1537); *DeClemente*, 860 F.Supp. at 53–54; *Life Indus.*, 827 F.Supp. at 933.

[203] *DeClemente*, 860 F.Supp. at 53–54; *Life Indus.*, 827 F.Supp. at 933.

[204] *Id.*

[205] To the contrary, the success of Gimlet's *Reply All* podcast is due to strong word-of-mouth, media acclaim, industry awards, and the stellar reputations of its founders, producers and podcast hosts. *See supra* notes 13, 196.

[206] *Gucci Am., Inc. v. Guess?, Inc.*, 868 F.Supp.2d 207, 243 (S.D.N.Y. 2012).

parties have had a trademark licensing relationship that facilitates computation of the reasonable royalty damages.[207] In the rare instance that a court considers a royalty absent a previously executed license agreement, prior negotiations between the parties are relevant to the royalty calculation because a highly speculative, hypothetical royalty analysis is entitled to no weight.[208] Although Gimlet Media denies that such a remedy is available or appropriate, a reasonable royalty would appropriately be limited to the negotiated $1 per year license in perpetuity previously proposed by Plaintiff.

### 3.    <u>Plaintiff Is Not Entitled To Injunctive Relief.</u>

Injunctive relief is the only available remedy where, like here, the plaintiff has not demonstrated that the infringement was willful.[209] However, "permanent injunctive relief will be granted only upon proof of the likelihood that purchasers of the product may be misled in the future."[210] Because, as discussed above, the likelihood is nil that future purchasers of either Party's product may be misled by Gimlet's use of its mark, Plaintiff's demand for injunctive relief must be denied.

## V.    <u>CONCLUSION</u>

For the reasons set forth hereinabove, Gimlet Media respectfully requests that this Court grant summary judgment to Gimlet Media on all counts and dismiss Plaintiff's Amended Complaint.

*    *    *    *    *    *

---

[207] *Juicy Couture, Inc. v. L'Oreal USA, Inc.*, No. 04 Civ. 7203, 2006 WL 1359955, at *4 (S.D.N.Y. May 18, 2006) (not reported); *The Apollo Theater Found., Inc. v. W. Int'l Syndication*, No. 02 Civ. 10037, 2005 WL 1041141, at *13 (S.D.N.Y. May 5, 2005) (not reported). *Cf. Gucci*, 868 F.Supp.2d 207 (S.D.N.Y. 2012).
[208] *Id.*
[209] *See* 15 U.S.C. § 1125(c)(2); *Mattel, Inc. v. Robarbs's, Inc.*, 139 F.Supp.2d 487, 494 (S.D.N.Y. 2001).
[210] *Starter Corp. v. Converse, Inc.*, 170 F.3d 286, 299 (2d Cir. 1999) (quoting *Burndy Corp. v. Teledyne Indus., Inc.*, 748 F.2d 767, 772–73 (2d Cir. 1984)).

WOLF, GREENFIELD & SACKS, P.C.

Dated:  December 1, 2017

*/s/ Stephanie G. Stella*
John L. Welch
Stephanie G. Stella (*admitted pro hac vice*)
600 Atlantic Avenue
Boston, MA 02210
Telephone: (617)-646-8000
john.welch@wolfgreenfield.com
stephanie.stella@wolfgreenfield.com

Scott I. Forman
WOLF, GREENFIELD & SACKS, P.C.
405 Lexington Avenue
New York, NY 10174
Telephone: (617)-646-8000
scott.forman@wolfgreenfield.com

*Attorneys for Defendant Gimlet Media, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 1, 2017, I served Defendant Gimlet Media, Inc.'s (1) Notice of Motions for Summary Judgment and Proposed Order, (2) Combined Memorandum of Law In Support of Its Motions for Summary Judgement, and (3) Declaration of Stephanie G. Stella, and Exhibits Thereto, In Support of Its Motions for Summary Judgment, on counsel for Plaintiff.

*/s/ Stephanie G. Stella*
Stephanie G. Stella