John G. Balestriere
Matthew W. Schmidt
**BALESTRIERE FARIELLO**
225 Broadway, 29th Floor
New York, New York 10007
Telephone:     (212) 374-5421
Facsimile:      (212) 208-2613
john.balestriere@balestrierefariello.com
matthew.schmidt@balestrierefariello.com
*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **REPLY ALL CORP.,**<br><br>                              Plaintiff,<br><br>– against –<br><br>**GIMLET MEDIA, INC.,**<br><br>                              Defendant. | Case No.: 1:15-cv-04950-WFK-PK<br><br>**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO DAMAGES**<br><br>*Served on Defendant on October 24, 2019* |

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS ........................................................................................................... 3

LEGAL STANDARD.................................................................................................................... 8

ARGUMENT .................................................................................................................................. 9

    I.    REPLYALL IS ENTITLED TO DISGORGEMENT OF GIMLET'S PROFITS BECAUSE OF GIMLET'S WILLFUL INFRINGEMENT OF REPLYALL'S MARK.................................................................................................................. 9

    II.    REPLYALL IS ENTITLED TO DISGORGMENT OF GIMLET'S PROFITS BECAUSE OF GIMLET'S FRAUDULENT REPRESENTATIONS IN OBTAINING THEIR INFRINGING MARK ............................................................ 10

    III.    DISGORGEMENT IS APPROPRIATE BECAUSE THE WILLFUL INFRINGEMENT IS LIKELY TO CONTINUE ABSENT INTERVENTION BY THIS COURT ................................................................................................................ 10

    IV.    THE PROFITS OF GIMLET'S INFRINGING MARK SUBJECT TO DISGORGEMENT, AS ADMITTED IN ACCOUNTING RECORDS OF SPOTIFY, ARE AT LEAST ███████ ............................................................ 11

CONCLUSION............................................................................................................................. 12

# **TABLE OF AUTHORITIES**

**Cases**

*Coach, Inc. v. Allen*,
  No. 11 Civ. 3590(CM), 2012 WL 2952890 (S.D.N.Y. July 19, 2012) ....................................... 8

*George Basch*, *v. Blue Coral, Co.*,
  968 F.2d 1532 (2d Cir. 1992) ................................................................................................... 9

*Lang Ret. Living Publ'g Co.*,
  949 F.2d 576 (2d Cir. 1991) ..................................................................................................... 9

*W. E. Bassett Co. v. Revlon, Inc.*,
  435 F.2d 656 (2d Cir. 1970) ............................................................................................... 9, 10

**Statutes**

15 U.S.C. §1120 ............................................................................................................................ 10

**Rules**

Fed. R. Civ. P. 56 ............................................................................................................................ 9

## PRELIMINARY STATEMENT

Plaintiff, ReplyAll Corp. ("ReplyAll") is entitled to judgment that, if it wins on liability, it is entitled to at least ▮▮▮▮ in damages (though more likely approximately $60 million or more in damages). ▮▮▮▮▮▮▮ is the amount that Defendant Gimlet Media, Inc. ("Gimlet") and its new corporate parent, Spotify USA, Inc. ("Spotify"), have documented in accounting records is the minimum value which they ascribe to their infringing Reply All trademark (the "Infringing Mark").

After years of insisting that the Infringing Mark was valueless—a position its damages expert doubled down on at his deposition just last week—Gimlet's damages position was put to the lie earlier this year by its new owner, Spotify, in internal documents—where the ▮▮▮▮ valuation was noted—and in filings with the U.S. Securities and Exchange Commission ("SEC")—which result in a calculation for the Infringing Mark of a value of as much as $60 million.

In February 2019 Spotify, one of the world's largest media companies, bought Gimlet, whose ▮▮▮▮▮▮▮ in the words of Spotify's accountants, is the Reply All podcast (the "Podcast"). That Podcast, with its Infringing Mark, constitutes 42% of the company's monthly downloads. Spotify paid ▮▮▮▮▮ for Gimlet and, of that purchase price, Spotify assigned approximately $142 million, almost three-fourths of the purchase price, to "goodwill," according to SEC filings. With a company like Gimlet, with few hard assets and employees and whose value is largely based on its intellectual property, the value of goodwill is often used to ascribe value to intellectual property. As such, using Spotify's own numbers — $142 million in goodwill of the total purchase price of ▮▮▮▮▮, and 42% of revenues from its primary and ▮▮▮▮▮

podcast, with its Infringing Mark — the value to Spotify of the Infringing Mark is likely at least $60 million.

But, at the barest minimum, Spotify's own post-acquisition accounting report (the "Duff & Phelps Report") assigns ▮▮▮ to the ▮▮▮ of the Reply All ▮▮▮ ▮▮▮ Thus, if the Court finds for ReplyAll on liability, ReplyAll is entitled to a minimum of ▮▮▮ in damages, though, again, ReplyAll will present evidence at trial, including through expert testimony, that the damages are in the range of $60 million.

Indeed, it is an undisputed fact (revealed in very recent discovery) that ▮▮▮ ▮▮▮ with the participation of its own counsel who filed notices of appearance in this very Court. As such, ▮▮▮ is certainly a greatly ▮▮▮ of Spotify's own true assessment of the value of the intellectual property it purchased, if, nonetheless, much ▮▮▮ than any one Gimlet has provided in this litigation over four years.

The Lanham Act grants such disgorgement of profits where, as here, the Defendant willfully infringed the Plaintiff's mark, or the Defendant procured the registration in the Patent and Trademark Office of a mark by false or fraudulent declaration or representation, or the disgorgement is necessary to prevent a willful infringer from continuing ongoing infringement. All three of these circumstances are present here, providing multiple avenues for this Court to find that disgorgement is the proper amount of damages.

Plaintiff's expert, based on only one damages theory used well before any recent discovery or securities filings, has assigned a range of present value under the "reasonable royalty" method from a low of at least ▮▮▮ to a high of ▮▮▮. However, such method is only one approach to measuring damages, and as Plaintiff's expert notes in his report, he "present[s] here one method of determining damages and that other methods may exist which might come to a

2

different conclusion." (Plaintiff LR56.1 ¶ 44.) The fact that the Infringing Mark accounts for 42% of Gimlet's monthly podcast downloads indicates that the actual value of the goodwill of the Infringing Mark is actually closer to $60 million, as will be proven at trial.

At a bare minimum, however, Spotify and Gimlet should not be able to ignore their own admissions—including those made in securities filings to the public—as to the value and profits on the Infringing Mark. The Court should enter judgment that, if ReplyAll wins on liability, it is entitled to a minimum of ▇▇▇▇▇▇ in liability. At trial ReplyAll intends to seek judgment that it is in fact owed $60 million or more.

## STATEMENT OF FACTS

*ReplyAll Is Incorporated And Registers Its Trademark*

Zachariah Abramowitz and Ari Gold incorporated ReplyAll on February 29, 2012. (Plaintiff's 56.1 Statement of Undisputed Facts, ("Plaintiff LR56.1") at ¶ 1.) ReplyAll, the registrant and owner of the registered trademark REPLYALL, United States Trademark Registration No. 4,391,220 (the "Mark"), filed on December 3, 2012, and registered on August 27, 2013, with the U.S. Patent and Trademark Office for computer services, creates publicly viewable conversations wherein registered group members are the only individuals who participate in the conversation. (Plaintiff LR56.1 ¶ 2.) ReplyAll is the owner of all rights, title, and interest to the ReplyAll trademark. (*Id.*) Since August 1, 2012, and continuing through the present, ReplyAll has used its Mark to provide an online service that allows content creators to easily publish conversational content on the Internet. (Plaintiff LR56.1¶ 3.) These conversations can be created and published on the ReplyAll website by any of the site's registered users. (Plaintiff LR56.1 ¶ 4.)

In late 2012, ReplyAll began raising money from friends and family investors, and Abramowitz transitioned from working nights and weekends for the company to working full-

3

time. (Plaintiff LR56.1 ¶ 5.) Between that time and early 2014, ReplyAll developed and launched the first version of their platform, which allowed users to host conversations only on the ReplyAll website. (Plaintiff LR56.1 ¶ 6.) Also, during that period, ReplyAll began advertising the platform to potential investors and began receiving angel round funds (Plaintiff LR56.1 ¶ 7.)

After finding that users of the platform would prefer to host conversations on their own websites and recognizing an opportunity to promote the ReplyAll brand to a wider audience, by June 2014 ReplyAll launched a second version of the platform, this time allowing users to embed conversations on other websites. (Plaintiff LR56.1 ¶ 8.) Since then, multiple sponsors have paid ReplyAll to have conversations published on multiple websites. (Plaintiff LR56.1 ¶ 9.) For the past few years, the primary focus of ReplyAll has been on publishing conversations, often sponsored, on external established websites such as *Above the Law*, *Dealbreak*, *Sports Illustrated*, *Huffington Post*, and *Bloomberg*. (Plaintiff LR56.1 ¶ 10.) The Mark is prominently displayed on every page of the ReplyAll website, and prominently displayed directly above conversations published on external sites. (Plaintiff LR56.1 ¶ 11.) In some instances, the sponsor of a conversation published on an external site pays Plaintiff to display the sponsor's mark in the place of the ReplyAll Mark. (Plaintiff LR56.1 ¶ 12.)

<em>Two Years After ReplyAll is Founded, Gimlet Media, Inc. Is Founded<br>And Launches Its Infringing "Reply All" Podcast</em>

After ReplyAll had developed and used its Mark for two years, Gimlet was founded as a Delaware corporation that produces media, primarily podcasts, with a principal place of business at 33 Flatbush Ave., Brooklyn, New York 11217. (Plaintiff LR56.1 ¶ 13.) November 6, 2014, two full years after ReplyAll had registered its Mark, and a half year after ReplyAll had already launched its second platform, Gimlet began using in commerce the Infringing Mark in connection with the Gimlet-produced podcast entitled "Reply All" (the "Podcast"). (Plaintiff LR56.1 ¶ 14.)

4

The Podcast, published weekly, now is "downloaded around 5 million times" every month. (Plaintiff LR56.1 ¶ 15.) Gimlet also now posts transcripts of most recent episodes of the Podcast so that consumers may read the interviews and conversations without having to listen to the audio files, thus creating a product that is exactly the same as Plaintiff's. (Plaintiff LR56.1 ¶ 16.)

ReplyAll learned of Gimlet's use of the Infringing Mark in November 2014, when searching for its company name, "Reply All," on Twitter and seeing that Gimlet was using the handle @replyall. (Plaintiff LR56.1 ¶ 17.) Plaintiff contacted Gimlet representatives soon after discovering Gimlet's use of a handle that infringed upon its Mark. (Plaintiff LR56.1 ¶ 18.) The parties corresponded via e-mail, and Gimlet proposed that licensing negotiations be conducted on an episode of its "StartUp" podcast, which Gimlet identifies as "a podcast about what its really like to get a business off the ground." (Plaintiff LR56.1 ¶ 19.)

Gimlet's podcast audiences are similar to and overlapping with Plaintiff's consumers. (Plaintiff LR56.1 ¶ 20.) The similarity between the Parties' consumers is the stated reason why Gimlet co-founders themselves, Alex Blumberg and Matt Lieber, proposed publishing their supposed settlement negotiations with ReplyAll on Gimlet's "StartUp" podcast. (Plaintiff LR56.1 ¶ 21.)

*Gimlet Reveals Its Bad Faith*

Gimlet invited ReplyAll to record the Parties' purported settlement negotiations, supposedly for publication on Gimlet's "StartUp" podcast. (*Id*.) In the December 2, 2014 recorded negotiations Gimlet President, Matthew Lieber, claimed that such public negotiations would be a way to clarify the admitted consumer confusion which Gimlet had created by use of its Infringing Mark, saying,

> I had thought that one way to *clear up that confusion* and also to give you guys a big, like, visibility— to give ReplyAll.me a big visibility boost here at like, near

5

launch, would be to feature you guys on StartUp, which is kind of what we're talking about right now. And-but-and, you know, explain very clearly what the difference between ReplyAll.me is and Reply All the podcast is and drive traffic to your site.

(Plaintiff LR56.1 ¶ 22 (emphasis added).)

During the call, Lieber conceded to ReplyAll's CEO, Abramowitz, that, "having started Reply All and gone through like the birthing pains of starting a company, and then as part of that, filing the Mark, it raises some eyebrows when a couple years later [Gimlet] comes along with a podcast and it's using the same name." (Plaintiff LR56.1 ¶ 23.)

Following the recorded supposed "settlement negotiations," the parties discussed creating a licensing agreement whereby Gimlet would cease its use of the @replyall Twitter handle, alter its logo, publish the StartUp recording to clear up any confusion, and pay one dollar annually for the rights to use the Mark in connection with the Podcast. (Plaintiff LR56.1 ¶ 24.) In December 2014, the Parties went so far as to draft several versions of a licensing agreement. (Plaintiff LR56.1 ¶ 25.) However, Gimlet then refused to publish the StartUp recording citing concerns over journalistic integrity that were mentioned for the first time nearly 40 minutes into the recorded "negotiation." (Plaintiff LR56.1 ¶ 26.) Moreover, Gimlet refused to agree to the terms Plaintiff required and thought had been settled between the Parties, including retiring the @replyall Twitter handle, and changing its logo. (Plaintiff LR56.1 ¶ 27.) Indeed, Defendant's co-founders began to act in a manner that caused ReplyAll's founders to question Defendant's trustworthiness and intentions. (Plaintiff LR56.1 ¶ 28.)

*Gimlet Registers Its Infringing Mark And Public Confusion Ensues*

Two months after hosting the discussions, on February 13, 2015, Gimlet Media made clear the real reason it had the conversations with ReplyAll. Armed with the information it obtained from ReplyAll during the purported negotiations, Gimlet filed a Trademark/Service Mark

6

Application Principal Register. (Plaintiff LR56.1 ¶ 29.) As part of the application, Matthew Lieber flat out lied in a Declaration in Lieu of Oath pursuant to Section 804.01(b) of the Trademark Manual of Examining Procedure. Lieber declared, under oath, "that to the best of [his] knowledge and belief, no other person has the right to use the mark in commerce, either in the identical form or in such near resemblance as to be likely, when used on or in connection with the goods/services of such other person, to cause confusion or mistake, or to deceive." (Plaintiff LR56.1 ¶ 30.) Lieber made this declaration despite the fact that two months earlier he participated in the recorded discussions with ReplyAll which he himself announced would supposedly be a means to "clear up that confusion" occurring in the marketplace. (Plaintiff LR56.1 ¶¶ 31–32.) Based on Lieber's fraudulent representations, the United States Patent and Trademark Office registered Gimlet's Infringing Mark on September 22, 2015, in connection with "entertainment services, namely, providing podcasts on the subject of the Internet." (Plaintiff LR56.1 ¶ 33.)

Subsequent to the filing of the Infringing Mark and continuous use of the Infringing Mark by the Defendant, for years and up to the present, Plaintiff has received emails, tweets, and social media posts demonstrating actual affiliation confusion between Plaintiff's ReplyAll product and Defendant's Podcast. (Plaintiff LR56.1 ¶ 34.) Such confusion has completely undermined ReplyAll's business development and made it difficult to find investors, while, of course, Gimlet, founded after ReplyAll, and developing its business through use of its ▮▮▮▮ Infringing Mark procured through Gimlet's fraud, has now been purchased for ▮▮▮▮▮. (Plaintiff LR56.1 ¶¶ 35–37.)

*Gimlet Is Acquired By Spotify And Spotify Manipulates*
*The Post-Acquisition Valuation Report, Spoliating Evidence Through Material Alteration*

Despite working with a different accounting firm prior to the Gimlet acquisition for business valuations, after Spotify purchased Gimlet, Spotify Chief Accounting Officer Luca

7

Baratta (who has since left the company) and Spotify Controller Paul Sawyer hired Duff & Phelps to create post-acquisition accounting valuations of Gimlet and the Reply All trademark. (Plaintiff LR56.1 ¶ 38.) Not only did Baratta and Sawyer curiously choose a new accounting firm to value the property at issue in this dispute, they actually had worked alongside the primary author of the report which values the Infringing Mark, Duff & Phelps Managing Director Greg Franceschi. (Plaintiff LR56.1 ¶ 39.)

Drafts of the Duff & Phelps post-acquisition valuation report dated April 3, 2019, and April 10, 2019, assign a value of ▄▄▄ to ▄▄▄▄▄▄▄▄▄▄▄▄ (Plaintiff LR56.1 ¶ 40.) However, the Final Valuation Report drafted by Duff & Phelps ▄▄▄▄ the language from ▄▄▄▄▄▄ to ▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄ (Plaintiff LR56.1 ¶ 41 (emphasis added).) Spotify's Rule 30(b)(6) witness, Controller Sawyer, actually admitted in his deposition that ▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄ before the final report was produced on July 9, 2019. (Plaintiff LR56.1 ¶ 42.) Moreover, he also admitted that not only did his former colleague—and his and Baratta's friend—Franceschi, ▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄ the accounting records which go to the heart of the value of Plaintiff's claim. (Plaintiff LR56.1 ¶¶ 43.)

## LEGAL STANDARD

A party is entitled to summary judgment "when there is no 'genuine issue of material fact' and the undisputed facts warrant judgment for the moving party as a matter of law." *Coach, Inc. v. Allen*, No. 11 Civ. 3590(CM), 2012 WL 2952890, at *6 (S.D.N.Y. July 19, 2012) (quoting Fed.

R. Civ. P. 56). It is well-established that "[s]ummary judgment may be granted to plaintiffs in cases alleging trademark infringement." *Id.* (citing *Lang Ret. Living Publ'g Co.*, 949 F.2d 576, 580 (2d Cir. 1991)).

## ARGUMENT

I. **REPLYALL IS ENTITLED TO DISGORGEMENT OF GIMLET'S PROFITS BECAUSE OF GIMLET'S WILLFUL INFRINGEMENT OF REPLYALL'S MARK**

This Court should order disgorgement of any profits Gimlet acquired through its use of the Infringing Mark due to the willfulness of Gimlet's actions. In the Second Circuit, when, as here, a Defendant willfully infringes on a mark, disgorgement is an appropriate method of determining damages. *George Basch, v. Blue Coral, Co.*, 968 F.2d 1532, 1539–40 (2d Cir. 1992). "It is essential to deter companies from willfully infringing a competitor's mark, and the only way the courts can fashion a strong enough deterrent is to see to it that a company found guilty of willful infringement shall lose *all* its profits from its use of the infringing mark." *W. E. Bassett Co. v. Revlon, Inc.*, 435 F.2d 656, 664 (2d Cir. 1970).

Defendant's use in commerce of a designation which is confusingly similar to the Mark, despite having actual and constructive notice of ReplyAll's prior rights in its Mark, constitutes an intentional conduct by Gimlet to make false technicians of origin and false descriptions about its services in commercial activities. Additionally, Gimlet had actual knowledge of ReplyAll's existing mark and registration and still forged ahead with their registration of an Infringing Mark obtained on the back of Lieber's fraudulent misrepresentations made under oath. Accordingly, disgorgement of Gimlet's profits—at a minimum █████, but actually more like $60 million—is appropriate here.

9

## II. REPLYALL IS ENTITLED TO DISGORGMENT OF GIMLET'S PROFITS BECAUSE OF GIMLET'S FRAUDULENT REPRESENTATIONS IN OBTAINING THEIR INFRINGING MARK

This Court should award Gimlet's profits to ReplyAll based solely upon Gimlet's fraudulent actions. Pursuant to 15 U.S.C. §1120, "any person who shall procure registration in the Patent and Trademark Office of a mark by a false or fraudulent declaration or representation, oral or in writing, or by any false means, shall be liable in a civil action by any person injured thereby for any damages sustained in consequence thereof." Gimlet President Matthew Lieber lied in his Declaration in Lieu of Oath when considering the substance of the settlement negotiations that had taken place two months previous to the Declaration. (Plaintiff LR56.1 ¶ 31.) If a company is found to have deliberately and fraudulently infringed on another's mark, a full accounting is proper as a deterrent. *W.E. Basset Co.*, 435 F.2d at 664. Here, ReplyAll is and was first in line to use the mark in conjunction with creating conversations for digestion by the public on the internet. Gimlet admitted their podcast name would "raise some eyebrows" and that "the issue here is about confusion," and, despite these acknowledgments in the recorded negotiations, still subsequently and willfully infringed upon the ReplyAll Mark diluting the marketplace, causing actual public confusion, and undermining the protections that ReplyAll should enjoy in its registered trademark.

## III. DISGORGEMENT IS APPROPRIATE BECAUSE THE WILLFUL INFRINGEMENT IS LIKELY TO CONTINUE ABSENT INTERVENTION BY THIS COURT

This Court should disgorge Gimlet's ill-gotten gains as a deterrent to the inevitable willful infringement that will continue to happen absent court intervention. "It is essential to deter companies from willfully infringing a competitor's mark, and the only way the courts can fashion a strong enough deterrent is to see to it that a company found guilty of willful infringement shall lose *all* its profits from its use of the infringing mark." *W.E. Bassett Co.,* 435 F.2d at 664. Moreover, "an accounting should be granted if . . . an accounting is necessary to deter a willful

10

infringer from doing so again." (*Id.*) The accounting and disgorgement are necessary to deter the willful and wanton infringer, Gimlet, and, even more, Gimlet's new owner, Spotify, from doing so again as ▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇ (Final Duff & Phelps Report at 34.) Given Spotify's massive share of the media market, its purchase will greatly amplify ReplyAll's damages, warranting disgorgement as a deterrent to Gimlet and now Spotify's willful infringement of ReplyAll's Mark.

IV. **THE PROFITS OF GIMLET'S INFRINGING MARK SUBJECT TO DISGORGEMENT, AS ADMITTED IN ACCOUNTING RECORDS OF SPOTIFY, ARE AT LEAST ▇▇▇▇**

If the Court finds Gimlet liable, it should enter damages in the amount of not less than ▇▇▇▇, even though at trial ReplyAll intends to show that damages are at least approximately $60 million. The Duff & Phelps report is greatly suspect: it was created while litigation here was pending (Plaintiff LR56.1 ¶ 31); Spotify's chief accounting officers hired a new accounting company to create this report after using another established company for years (Plaintiff LR56.1 ¶ 38); those same officers hired their former colleague and friend to draft the report (Plaintiff LR56.1 ¶ 43); Spotify specifically asked Duff and Phelps to ▇▇▇ the report (Plaintiff LR56.1 ¶ 42); and, most disturbing of all, lawyers who have appeared as litigators before this Court were present when Spotify asked that the report be ▇▇▇▇ (Plaintiff LR56.1 ¶ 43.) Nonetheless, the doctored accounting report remains an admission by Gimlet and Spotify of the barest minimum value of the Infringing Mark. While relevant evidence shows the true value of the Infringing Mark is many multiples of this ▇▇▇▇, if ReplyAll prevails on liability then the absolute minimum damages should be ▇▇▇▇.

11

## **CONCLUSION**

Gimlet's profits due to the Infringing Mark, which evidence shows to be approximately $60 million or more, but which Spotify and Gimlet admit to be at least ▮▮▮▮▮, should be disgorged if there is a finding of liability. Gimlet's infringement is willful, Gimlet procured registration in the Patent and Trademark Office of the Infringing Mark by way of a false or fraudulent declaration or representation, and the willful infringing use is likely to continue absent intervention by this Court. Any one of these conditions would be sufficient for the Court to order disgorgement of damages, but since all three are present disgorgement is particularly appropriate here.

Moreover, Gimlet has wrongly benefitted through its use of its Infringing Mark, procured through the false and fraudulent representations of Lieber, riding its marquee Infringing Mark all the way to its sale to Spotify for ▮▮▮▮▮. Meanwhile, ReplyAll has sustained damages in the fact that their brand and intellectual property has been smothered in the crib by Gimlet's willful disregard for ReplyAll's Mark and brand. For all the foregoing reasons, ReplyAll respectfully requests that this Court grant its motion for summary judgment, putting a floor on damages of at least ▮▮▮▮▮ as this is the value Defendant's corporate parent, Spotify, has admitted the Infringing Mark is worth, and grant such other and further relief as the Court deems just and proper.

Dated: New York, New York
       October 24, 2019

By: _____
John G. Balestriere
Matthew W. Schmidt
**BALESTRIERE FARIELLO**
225 Broadway, 29th Floor
New York, New York 10007
Telephone:   (212) 374-5421
Facsimile:   (212) 208-2613
john.balestriere@balestrierefariello.com
matthew.schmidt@balestrierefariello.com
*Attorneys for Plaintiff*

13