**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK
BROOKLYN DIVISION**

REPLY ALL CORP.,

       Plaintiff,

v.

GIMLET MEDIA, INC.

       Defendant.

Civil Action No. 1:15-CV-04950-WFK-PK

████████████████████████

SERVED MARCH 13, 2020

**DEFENDANT GIMLET'S MEMORANDUM OF LAW IN SUPPORT OF ITS
MOTION FOR ATTORNEYS' FEES**

John L. Strand
Bryan S. Conley
Amanda B. Slade
600 Atlantic Avenue
Boston, MA 02210
Telephone: (617) 646-8000
john.strand@wolfgreenfield.com
bryan.conley@wolfgreenfield.com
amanda.slade@wolfgreenfield.com

**TABLE OF CONTENTS**

PROCEDURAL BACKGROUND AND HISTORY ................................................................ 2

ARGUMENT ................................................................................................................ 5

I.  Because This Case "Stands Out From Others," Gimlet Should Be Awarded Its
    Attorneys' Fees ..................................................................................................... 5

    A.  Legal Standard for Attorneys' Fees Under the Trademark Statute .................................. 5

    B.  Plaintiff Stubbornly Litigated Objectively Baseless Claims and Positions ..................... 6

        1.  Plaintiff's Complaint Showed the Weakness of Its Case .............................................6

        2.  Plaintiff Maintained Damages Theories That Have No Legal Basis—
            Including Theories Rejected as "Fundamentally Flawed" .........................................7

        3.  Plaintiff's Continued Unjustified Reliance on Instances of Non-Cognizable
            "Confusion" ..................................................................................................14

        4.  Plaintiff Raised Baseless Discovery Issues And Did Not Even Utilize The
            Documents It Pushed For ...............................................................................16

        5.  Plaintiff's and Plaintiff's Counsel's Additional Baseless Lawsuits and
            Claims of Spoliation .....................................................................................16

        6.  Summary Judgment Granted in Gimlet's Favor ......................................................19

        7.  Plaintiff's Pretrial ........................................................................................21

II. Plaintiff's Current Attorneys Unreasonably and Vexatiously Multiplied These
    Proceedings, Justifying an Award of Fees and Expenses to Gimlet ...................................... 22

    A.  Legal Standard for Attorneys' Fees Under 28 U.S.C. § 1927 ........................................ 22

    B.  Plaintiff's Counsel Should Be Sanctioned for Maintaining Multiple Baseless
        Damages Claims .......................................................................................... 23

    C.  Plaintiff's Counsel Should Be Sanctioned for Making Baseless Accusations and
        Threatening Baseless Lawsuits ........................................................................ 24

CONCLUSION ............................................................................................................. 25

i

## **TABLE OF AUTHORITIES**

**CASES**

*adidas Am., Inc. v. Payless Shoesource, Inc.*,
  2008 WL 4279812 (D. Or. Sept. 12, 2008) ............................................................. 12

*Apollo Theater Found., Inc. v. W. Int'l Syndication*,
  2005 WL 1041141 (S.D.N.Y. May 5, 2005) ............................................................. 10

*Astrazeneca AB v. Dr. Reddy's Labs.*,
  2010 WL 1375176 (S.D.N.Y. Mar. 30, 2010) ............................................................ 5

*Coleman v. Oasis Outsourcing, Inc.*,
  779 F. App'x 649 (11th Cir. 2019) ............................................................................. 24

*CTS v. Electro Materials Corp. of Am.*,
  469 F. Supp. 801 (S.D.N.Y. 1979) .............................................................................. 5

*Enmon v. Prospect Capital Corp.*,
  675 F.3d 138 (2d Cir. 2012) ...................................................................................... 25

*Eon-Net LP v. Flagstar Bancorp*,
  653 F.3d 1314 (Fed. Cir. 2011) .................................................................... 16, 17, 24

*E-Pass Techs. v. 3Com*,
  2007 WL 4170514 (N.D. Cal. Nov. 14, 2007) ........................................................... 5

*George Basch Co. v. Blue Coral, Inc.*,
  968 F.2d 1532 (2d Cir. 1992) ...................................................................................... 8

*Joao Bock Transaction Sys. v. Jack Henry & Assoc.*,
  2016 WL 1267159 (D. Del. Mar. 31, 2016) ............................................................... 5

*Lang v. Ret. Living Publ'g Co.*,
  949 F.2d 576 (2d Cir. 1991) ...................................................................................... 14

*Lawson v. Rubin*,
  No. 17-CV-6404-BMC, Slip Op. (Oct. 5, 2018), Dkt. 189 ...................................... 22

*Life Indus. Corp. v. Ocean Bio-Chem, Inc.*,
  827 F. Supp. 926 (E.D.N.Y. 1993) ........................................................................... 10

*Micromesh Tech. v. Am. Rec. Prods.*,
  2007 WL 2501783 (N.D. Cal. Aug. 30, 2007) ........................................................... 5

*Mohammed v. Delta Air Lines*,
  2011 WL 5553827 (E.D.N.Y. Jun. 8, 2011) ............................................................. 24

*Nelson v. MillerCoors*,
   246 F. Supp. 3d 666 (E.D.N.Y. 2017) ...................................................................... 17

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
   572 U.S. 545 (2014)....................................................................................................... 5

*PaySys Int'l, Inc. v. Atos Se*,
   2019 WL 2051812 (S.D.N.Y. May 9, 2019) ............................................................ 23

*Ray v. Balestriere Fariello LLP*,
   No. 18-CV-11211-KPF, Slip Op. (Oct. 16, 2019 S.D.N.Y) .................................. 22

*Sleepy's LLC v. Select Comfort Wholesale Corp.*,
   909 F.3d 519 (2d Cir. 2018) ......................................................................................... 5

*Sprint Sols. v. iCell Guru*,
   2016 WL 3198248 (E.D.N.Y. June 7, 2016) ............................................................ 17

*U.S. v. Int'l Bhd. of Teamsters*,
   948 F.2d 1338 (2d Cir. 1991) ..................................................................................... 22

*Uniloc USA, Inc. v. Microsoft Corp.*,
   632 F.3d 1291 (Fed. Cir. 2011) ................................................................................. 10

*Yufa v. TSI Inc.*,
   2014 WL 4071902 (N.D. Cal. Aug. 14, 2014) ........................................................... 7

## STATUTES

15 U.S.C. § 1117......................................................................................... 1, 5, 22, 25

28 U.S.C. § 1927.............................................................................................. 1, 22, 25

Defendant Gimlet Media, Inc. moves to recover its attorneys' fees pursuant to 15 U.S.C. § 1117, which allows for the recovery of attorneys' fees in exceptional cases, pursuant to 28 U.S.C. § 1927, which allows for the recovery of attorneys' fees from the other party's counsel where that counsel "multiplies the proceedings in any case unreasonably and vexatiously," and under the Court's inherent powers. A fair estimate of the fees that Gimlet seeks total about $1.4M.

The litigation between Plaintiff and Gimlet was "exceptional"—it stood out from an ordinary trademark litigation—both because of Plaintiff's baseless claim and because of how Plaintiff's counsel litigated the case, namely, pressing for irrelevant discovery, pursuing legally and factually debunked damages theories, and threatening baseless spin-off lawsuits once it became clear that the trademark suit had no merit. As discussed in more detail herein:

- Plaintiff failed to prevail on even a single *Polaroid* factor, and its case was baseless from the start, as was manifestly evident from the facts Plaintiff set out in its complaint (*see* Sections I.B.1 and I.B.6);

- Plaintiff's and its counsel's outsized demands for damages kept increasing as the case progressed, as did its sheer number of damages theories; Plaintiff and its counsel chose not to pare those demands back in light of the facts, instead forcing Gimlet to defend against numerous competing theories, including those barred by the Second Circuit and others that have been found "fundamentally flawed" (*see* Section I.B.2);

- Since the beginning of this case, and even facing Gimlet's summary judgment motion, Plaintiff relied on—indeed, touted—examples of "confusion" that did not constitute trademark confusion under black letter Second Circuit law (*see* Section I.B.3);

- Plaintiff and its counsel also pressed on discovery issues and demanded documents allegedly related to damages that it should have known were irrelevant, and then Plaintiff's counsel did not even provide the documents to its damages expert (*see* Section I.B.3);

- Plaintiff and its counsel threatened Gimlet—and numerous others—with baseless lawsuits in an attempt to drive up its settlement figure (*see* Section I.B.5);

- The frivolous nature of Plaintiff's case—going so far as to call Gimlet's founder a liar—was exposed at summary judgment (*see* Section I.B.6); and,

- Plaintiff ignored this Court's rules in the run-up to trial, when Gimlet's counsel was trying to work with Plaintiff's counsel to prepare the pretrial order (*see* Section I.B.7).

For these reasons, detailed below, Gimlet respectfully requests that the Court find this case "exceptional" and find that Plaintiff's current counsel unreasonably and vexatiously multiplied

these proceedings—especially related to damages and Plaintiff's proposed baseless lawsuits—and award Gimlet its reasonable attorneys' fees and expenses, including those incurred in preparing this motion and related papers.

## PROCEDURAL BACKGROUND AND HISTORY

The history between the parties is set forth in Gimlet's Summary Judgment Motion (Dkt. 166 at 4-7), and summarized in the Court's summary judgment ruling. (Dkt. 181 at 1-3.) Here, Gimlet sets forth the basic procedural history of the case.

On August 24, 2015, Plaintiff filed its complaint, alleging trademark infringement. (Dkt. 1.) Gimlet denied the substance of Plaintiff's complaint. (Dkt. 8.) After some discovery, Plaintiff hired new counsel who sought to expand this action, and on July 25, 2017, amended Plaintiff's complaint to add a claim for "reverse confusion." (Dkt. 71.)

On December 1, 2017, Gimlet served its first motion for summary judgment. (Dkt. 89.) Plaintiff relied upon facially deficient arguments to respond to the motion, including a claim of "actual confusion" based on mis-tagged social media post, and a defamatory accusation that Gimlet's co-founder allegedly lied to the Trademark Office. (*See, e.g.*, Dkt. 108 at 1-3.) Once summary judgment was fully briefed, the parties largely ceased litigating.

Then, in early February 2019, Spotify purchased Gimlet for approximately $200M.[1] Eyeing the purchase price, Plaintiff reinvigorated the litigation. The parties once again sat down to mediate the dispute. Shortly before the mediation, in an apparent attempt to apply more pressure on Gimlet, Plaintiff's counsel emailed to Gimlet a copy of a draft complaint alleging claims against not only Gimlet, but also Spotify, Gimlet's founders individually, and the two hosts of the *Reply All* podcast.[2] Besides an "unfair competition" claim that tracked the trademark claims in this case,

---

[1] *See* Dkt. 157, Decl. of Paul Sawyer in Support of Def.'s Summ. J. Papers ("Sawyer Decl.") at ¶ 3; Dkt. 157, Ex. T, Final Duff & Phelps Report (July 9, 2019) at SPOTIFY00385.

[2] Strand Decl., ¶ 5; Ex. 1, Draft Complaint, *Reply All Corp. v. Spotify USA Inc.* (N.Y. Sup. Ct. May 17, 2019) (unfiled). All exhibits that were not previously filed are numbered and attached to the Declaration of John Strand, Esq. ("Strand Decl."), filed with this brief.

Plaintiff added claims of "promissory estoppel" and "unjust enrichment." After the mediation, Plaintiff never filed the complaint.

The parties agreed to request a re-opening of discovery for the limited purpose of providing discovery that "related to [Spotify's] acquisition of [Gimlet] that relate to or concern a valuation of the Gimlet Reply All podcast or the Reply All mark as used in association with the Gimlet Reply All podcast." (Dkt. 128.) Gimlet and Spotify lived up to their obligations, producing more pages of documents than previously produced in the litigation, and permitting Plaintiff to take two depositions of Spotify employees, and a Spotify Rule 30(b)(6) deposition.[3]

Plaintiff, however, was not satisfied. After the depositions, Plaintiff's counsel served five new subpoenas for depositions, including several directed to non-parties.[4] With no citation to any relevant law, it was at this same time that Plaintiff first alleged that Spotify, Gimlet, and their counsel were involved in the "spoliation" of documents.[5]

In an attempt to resolve this issue amicably, Gimlet's counsel met and conferred with Plaintiff's counsel over several months; Spotify even produced additional documents that it did not believe it was required to produce under the Stipulation.[6] But Plaintiff and its counsel refused to budge—particularly on the subpoenas. Plaintiff moved to compel (Dkt. 137) and Gimlet moved for a protective order and to quash the subpoenas (Dkt. 143). During the hearing on the parties' motions, Magistrate Judge Kuo cut Plaintiff's position down, finding the language of the parties' stipulation "pretty clear" and ruling against Plaintiff. (Dkt. 142 at 18:7.) Notably, Plaintiff never brought its baseless claims of spoliation before Magistrate Judge Kuo for resolution.[7]

---

[3] Strand Decl., ¶ 2.

[4] *See* Ex. 2, Subpoenas Served on Molly Plimpton, Michael Bayer, Luca Baratta, Greg Franceschi, and Adithya Ramesh (July 18, 2019).

[5] *See* Ex. 3, 7/23/19 Letter from Balestriere to Strand, at 9-10.

[6] Strand Decl., ¶ 3.

[7] *Id.*, ¶ 4.

Also, during the entire meet and confer process, Plaintiff's counsel, in its letter briefs to the Court seeking production of documents, maintained that the requested documents would allow Plaintiff "to develop Plaintiff's damages theories" and thus that they were "highly relevant." (Dkt. 137 at 1, 3.) But then, despite the fact that Spotify produced several of the requested "highly relevant" documents, Plaintiff's counsel never gave those documents to its own damages expert.[8]

Eventually, at Plaintiff's request (Dkt. 129), the parties entered another round of summary judgment briefing, this time focusing on Plaintiff's myriad competing disgorgement of profits and reasonable royalty damages theories. (*See, e.g.*, Dkt. 156 & 157.) Throughout this briefing, Plaintiff not only re-raised and focused on the same baseless allegations it did during the first round of summary judgment, but also raised—without requesting the Court resolve—its baseless spoliation claim. (Dkt. 156.)

During summary judgment briefing, the parties again met to discuss settlement. Plaintiff's counsel repeated its previous play and provided another proposed complaint ("Second Draft Complaint").[9] This time, Plaintiff proposed adding *17 defendants and 14 new claims*. Moreover, its counsel drafted the complaint with confidential information learned through discovery. After Plaintiff's counsel was unable to pressure Gimlet into a multi-million dollar settlement, Plaintiff requested that the Court permit it to file its Second Draft Complaint, including the confidential information. (Dkt. 169.) Magistrate Judge Kuo, in her January 30, 2020 Order, swiftly rejected Plaintiff's attempt to skirt the Protective Order. (Dkt. 177 at 8:15-22.) As Magistrate Judge Kuo rightly determined, the clear language of the Protective Order, which mandated that "[a]ll information produced in discovery in this litigation, regardless of whether it's designated confidential, shall be used solely for the prosecution or defense of this litigation," prohibited filing the new complaint. (*Id.* at 10:7-22.) Plaintiff did not let the issue drop. Instead, it sought a pre-

---

[8] Dkt. 158, Ex. 21, 9/20/19 Edelman Tr., at 5:8-6:3.
[9] Dkt. 169, Ex. A; Strand Decl., ¶ 6.

motion conference to request permission to once again amend its complaint. (Dkt. 178.) This conference became moot when the Court granted Gimlet's summary judgment motion. (Dkt. 181 & 182.)

**ARGUMENT**

I. **Because This Case "Stands Out From Others," Gimlet Should Be Awarded Its Attorneys' Fees**

      A. **Legal Standard for Attorneys' Fees Under the Trademark Statute**

Title 15 U.S.C. § 1117 provides that in a trademark action "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." As per the Supreme Court's *Octane* decision, the determination of whether a case is "exceptional" is a flexible one. *Sleepy's LLC v. Select Comfort Wholesale Corp.*, 909 F.3d 519, 531 (2d Cir. 2018) (applying the *Octane* standard, a patent case, to trademark cases) *citing Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545 (2014). More particularly, the Supreme Court held that "an 'exceptional' case is simply one that stands out from others with respect to the substantive strength of a party's litigating position or the unreasonable manner in which the case was litigated." *Octane*, 572 U.S. at 554.

A fee award protects "the interest of the public in confining such rights to their legal limits," and "is the only protection available to an unjustly accused infringer." *Astrazeneca AB v. Dr. Reddy's Labs.*, 2010 WL 1375176, at *9 (S.D.N.Y. Mar. 30, 2010) (quotations omitted). Baseless positions even on non-dispositive issues can support a fee award. *Joao Bock Transaction Sys. v. Jack Henry & Assoc.*, 2016 WL 1267159, at *3 (D. Del. Mar. 31, 2016). Having forced Gimlet to waste resources rebutting numerous baseless theories, Plaintiff cannot now hide behind the fact that only some of the defects in its case needed to be adjudicated. *E-Pass Techs. v. 3Com*, 2007 WL 4170514 at *10 (N.D. Cal. Nov. 14, 2007) (awarding fees for unadjudicated defenses and refusing "to exclude the fees simply because the claim was resolved on another ground."); *Micromesh Tech. v. Am. Rec. Prods.*, 2007 WL 2501783, at *7 (N.D. Cal. Aug. 30, 2007) (finding case exceptional even where "the merits of an assertedly baseless claim" had not been reached, to

avoid "a windfall for plaintiffs."); *CTS v. Electro Materials Corp. of Am.*, 469 F. Supp. 801, 823 (S.D.N.Y. 1979) (awarding fees based on patentee's misconduct even where merits not reached).

###### B. Plaintiff Stubbornly Litigated Objectively Baseless Claims and Positions

###### 1. Plaintiff's Complaint Showed the Weakness of Its Case

Plaintiff's original (and amended) complaint set forth alleged facts that should have pointed to the weakness of its case and show why this case "stands out from others."

To begin, Plaintiff alleged that it used the mark REPLYALL for "an online service that allows content creators to easily publish conversational content on the Internet" (Dkt. 1, ¶ 7), while also admitting that Gimlet used the mark REPLY ALL for different services, namely, "entertainment services, namely, providing podcasts on the subject of the internet" (Dkt. 1, ¶ 19). As the Court found at summary judgment, this difference was substantial: "There is significant competitive distance between Plaintiff's software and the production and monetization of Defendant's podcast business." (Dkt. 181 at 10.)

Further, alleging "actual confusion" in the marketplace, Plaintiff included a screenshot from its LinkedIn account. But that screenshot shows that Plaintiff had no "likes," "comments," or "shares," in the week and month preceding the screenshot (Dkt. 1, ¶ 29), plainly showing the weakness and lack of market penetration of Plaintiff's mark. This screen shot alone should have pointed Plaintiff's counsel to the same conclusion that the Court reached: "Plaintiff's lack of sales, marketing expenditures, and general absence from the marketplace demonstrate a lack of commercial strength." (Dkt. 181 at 7 (citations omitted).) Because Plaintiff forged ahead with such a weak mark, demonstrated by *Plaintiff's own complaint*, this case stands out.

Finally, Plaintiff attached to the complaint Gimlet's counsel's pre-suit letter to Plaintiff, which explained why there is no likelihood of confusion between the parties.[10] That letter, in large part, tracks this Court's conclusions on summary judgment, including:

---

[10] Dkt. 1, Ex. C, 3/17/15 Letter from Wolf and Duff to Abramowitz.

- Both the Court and Gimlet's counsel noted the difference in services offered by the parties (*compare* Dkt. 1, Ex. C. ("Our client, Gimlet Media, provides wholly discrete services under REPLY ALL such that no reasonable consumer would be confused.") and Dkt. 181 at 10 ("There is significant competitive distance between Plaintiffs software and the production and monetization of Defendant's podcast business.")).

- Both the Court and Gimlet's counsel observed the weakness of Plaintiff's mark, in particular because of the presence of another registration for the mark REPLY ALL for an on-line comic strip (*compare* Dkt. 1, Ex. C ("we recognize the existence of third parties uses such as Federal Registration No. 4,691,484 for REPLY ALL, for, in part, '[p]roviding online non-downloadable comic strips and cartoons; providing on-line publications in the nature of comic strips and cartoons.'") and Dkt. 181 at 7 ("'Reply All' is the federally registered trademark of third party individual Donna Lewis.")).

The fatal weakness of its case should have been evident to Plaintiff and its counsel. *See Yufa v. TSI Inc.*, 2014 WL 4071902, at *5 (N.D. Cal. Aug. 14, 2014) (finding case exceptional when plaintiff "should have known" its case was "objectively baseless").

### 2. Plaintiff Maintained Damages Theories That Have No Legal Basis— Including Theories Rejected as "Fundamentally Flawed"

Most egregious—and what really caused this litigation to go on so long without a settlement—were the "moving target" damages theories that Plaintiff and its expert maintained, even though they were baseless. Despite Plaintiff's claim that Gimlet's use of the title *Reply All* was the reason for Plaintiff's failure, Plaintiff **never** offered any proof of lost sales or damage to its economic value resulting from Gimlet's lawful use of its federally registered REPLY ALL mark. Plaintiff neither placed any value on its mark, nor attempted to quantify any **actual** damages. In fact, Plaintiff testified twice it could not name a single investor or customer that it lost.[11]

To prevail on its damages claims, Plaintiff had to show not only that Gimlet infringed Plaintiff's mark, but also that Gimlet acted deceptively or in bad faith in doing so, and that Plaintiff has sustained pecuniary loss as a result of the infringement. Although Plaintiff could not succeed on its claims as a matter of law, Plaintiff and its counsel nevertheless maintained numerous, sometimes contradictory, claims in attempting to extract a windfall settlement.

---

[11] Dkt. 89, Ex. L, 9/13/16 Abramowitz Tr., at 36:10-38:18, 206:22-207:12, 286:25-287:4; Ex. 4, 10/20/17 Abramowitz Tr., at 73:19-74:19.

Further, that Plaintiff's chosen expert, Marc Edelman, would maintain such baseless theories is also hardly surprising. Prof. Edelman is a personal friend of both Mr. Abramowitz and of Plaintiff's prior counsel Darren Heitner. (*See* Dkt. 94 at 73-74.) Indeed, even if Plaintiff's damages theories advocated by Prof. Edelman had any merit—and they do not—Gimlet's exposure of Prof. Edelman's clear bias at trial would have undermined his credibility.

Worse yet, in their pursuit of a windfall (and refusal to litigate sensibly), Plaintiff and its counsel advanced damages theories, after the close of discovery, not even supported by Plaintiff's own expert. These theories, based wholly on attorney argument, were likewise baseless.

***Disgorgement of Profits.*** Plaintiff and its expert advanced various disgorgement of profits damages theories, but Plaintiff had no basis for claiming such damages. Gimlet explained this point in its initial summary judgment motion in December 2017; when Plaintiff persisted in maintaining this baseless theory, Gimlet more fully explained the infirmity of this theory in its second summary judgment motion. (*See* Dkt. 89 at 39; Dkt. 157 at 3, 21-24.) Critically, to recover Gimlet's profits in the Second Circuit, Plaintiff needed to show Gimlet had a deceptive intent in adopting its mark. *George Basch Co. v. Blue Coral, Inc.*, 968 F.2d 1532, 1538 (2d Cir. 1992). Plaintiff never disputed its burden to meet this showing. Instead, Plaintiff repeatedly doubled-down on its baseless (and libelous) claim that Gimlet "acted willfully and fraudulently and adopted [its] mark in bad faith." (Dkt. 168 at 7.) But, even though it was Plaintiff's burden to show bad faith adoption of the mark, the record evidence actually showed ***the opposite***—Gimlet adopted the mark REPLY ALL in good faith:

- Gimlet was not aware of Plaintiff's use of the REPLYALL mark for software when Gimlet first came up with the mark;
- Gimlet consulted an attorney when it adopted its mark and the attorney cleared Gimlet's use of the REPLY ALL mark; and,
- The Trademark Office issued Gimlet its own registration for the REPLY ALL mark for podcast services (U.S. Reg. No. 4,817,504), despite the Trademark Office having

considered Plaintiff's existing registration. Plaintiff did not oppose the REPLY ALL application, and Gimlet still maintains its registration. (Dkt. 157 at 3, 21-24.)

There was simply no evidence that Gimlet adopted its REPLY ALL mark with the intent to trade off of Plaintiff's goodwill or otherwise cause confusion. The Court agreed: "There is *no evidence* Defendant selected the Reply All mark in bad faith." (Dkt. 181 at 13.)[12] The Court further confirmed that "[Gimlet] could not have adopted the mark with the intention of capitalizing on Plaintiffs reputation or goodwill because [Gimlet] did not know Plaintiff existed at the time it selected the mark," and recognized that "[Gimlet]'s actions in engaging in negotiations, seeking the advice of counsel, and successfully registering its mark with the UPSTO are strong indicia of good faith on the part of [Gimlet]." (*Id.*)

To be sure, prior to filing its complaint, seeking disgorgement of profits, Plaintiff *already knew* from the parties' pre-suit settlement discussions that Gimlet viewed the goods and services as being very different; that Gimlet did not believe that Plaintiff had a strong infringement claim; and that Gimlet had sought the advice of counsel, who confirmed Gimlet's belief that using REPLY ALL as its podcast title would not infringe any of Plaintiff's purported rights.[13] Yet, Plaintiff wholly ignored these undisputed facts—calling into question Plaintiff's Rule 11 basis for, among other things, asserting a claim for disgorgement of profits in the first place. And, even after discovery *confirmed* that Gimlet was not aware of Plaintiff's existence at the time Gimlet independently selected its mark (Dkt. 181 at 14), Plaintiff and its counsel *still* maintained this baseless damages claim.

Further, actual consumer confusion is also required to recover damages and, as the Court confirmed, "[d]rawing all plausible inferences in favor of the Plaintiff," "there is scant evidence to support a finding of actual confusion." (Dkt. 181 at 12.)

---

[12] All emphasis added unless otherwise noted.
[13] *See, e.g.*, Dkt. 157, Ex. AH, Certified Tr. of Audio Recording of Parties' Negotiations, at 16:19-17:18.

- 9 -

Thus, as a matter of law, Plaintiff should have known from the outset that it could not have recovered Gimlet's alleged profits.

**Reasonable Royalty—Generally.** For many of the same reasons why Plaintiff could not recover Gimlet's profits, it also could not recover reasonable royalty damages: it had not shown either deceptive intent or actual confusion. (*See, e.g.*, Dkt. 157 at 27-28.) *See Life Indus. Corp. v. Ocean Bio-Chem, Inc.*, 827 F. Supp. 926, 932 (E.D.N.Y. 1993) ("Before a plaintiff is entitled to actual damages, he must prove either (1) 'actual consumer confusion or deception resulting from the violation,' or (2) 'that the defendant's actions were intentionally deceptive thus giving rise to a rebuttable presumption of consumer confusion.'") (internal citations omitted).

Even if Plaintiff could have cleared these hurdles, reasonable royalty damages were not appropriate, since, unlike here, such damages are awarded only in trademark cases where there was a pre-existing licensing arrangement. (Dkt. 71, ¶ 52.)[14] *See Apollo Theater Found., Inc. v. W. Int'l Syndication*, 2005 WL 1041141, at *13 (S.D.N.Y. May 5, 2005). Reasonable royalty damages were thus improper, as Gimlet *twice* explained to Plaintiff. (Dkt. 89 at 39-40; Dkt. 157 at 27-33.)

Assuming *arguendo* that the Court would have permitted Plaintiff to seek reasonable royalty damages, Gimlet alternatively requested the Court exclude Plaintiff's damages expert's reasonable royalty opinions. (Dkt. 157 at 3-4, 29-32.) Prof. Edelman offered three disparate royalty rate opinions, each of which was impermissibly speculative and untethered from the facts.

**Reasonable Royalty—The "25% Rule of Thumb."** Plaintiff, its counsel, and Plaintiff's expert advocated a 25% royalty "rate" based on the so-called "25% rule of thumb"—a methodology that the Federal Circuit has called "a fundamentally flawed tool for determining a baseline royalty rate." *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1291, 1315 (Fed. Cir. 2011). As Gimlet explained, this 25% royalty "rate" is not a royalty rate at all. Instead, it is a theoretical

---

[14] Dkt. 157, Ex. AQ, Pl.'s Resp. to Gimlet's Interrog. No. 9.

"rule of thumb" based on the theory that a licensor of a patent should share part of the profits of its licensee—namely, that the licensor should be entitled to roughly 25% of the licensee's profits.[15] The "25% rule," however, is not only inappropriate here, but it is a widely discredited methodology occasionally used to calculate a reasonable royalty in patent—not trademark—cases. (Dkt. 157 at 30 & n.70.) Plaintiff never argued otherwise. Indeed, neither Plaintiff nor its expert seemed to be aware of *any* case law applying the "25% rule" in trademark cases. (*Id.* at 31 & n.75.) On the other hand, Gimlet's expert, Colin Weir, testified—unequivocally—that the "25 percent rule of thumb" is "*inappropriate*" for a number of reasons."[16]

Notwithstanding that Prof. Edelman's use of the 25% rule alone warranted exclusion under Rule 702, Mr. Weir confirmed that Prof. Edelman's incorrect application of the 25% rule is "fatal" here.[17] Prof. Edelman **completely misapplied** the rule by calculating 25% of Gimlet's **revenues** instead of its **profits**, naturally—and potentially intentionally—leading to an inflated damages figure. (Dkt. 157-1 at 4, 29-31.) As Mr. Weir explained, "[n]owhere have I seen a suggestion that the 25 percent rule, if it's going to be used at all, should be applied to revenues rather than profits."[18] While Plaintiff never substantively disputed that Prof. Edelman misapplied the "25% Rule of Thumb,"[19] such inflated damages amounts hampered settlement.

*Reasonable Royalty—The* ▮ *Royalty Rate.* Prof. Edelman's use of a ▮ royalty rate was likewise impermissibly speculative. Prof. Edelman inappropriately co-opted the ▮ figure from a post-acquisition accounting report commissioned by Spotify from consulting firm Duff & Phelps, after Spotify's Gimlet acquisition (the "D&P Report"). (Dkt. 157 at 31.) The D&P Report

---

[15] Dkt. 157 at 30 & n.71; *see* Dkt. 157-2 at ¶ 25.

[16] Dkt. 158, Ex. 22, 4/26/17 Weir Tr., at 145:5-10, 146:4-9.

[17] Dkt. 158, Ex. 22, 4/26/17 Weir Tr., at 145:5-17.

[18] Dkt. 158, Ex. 22, 4/26/17 Weir Tr., at 145:12-15.

[19] Dkt. 158, Pl.'s Resp. to Def.'s Rule 56.1 Statement at ¶ 24 (admitting to Prof. Edelman's particular use of "the 25% Rule").

████████████████████████████████████████

████████████████, and it was not intended for use in determining a reasonable royalty rate.[20] While Plaintiff argued that its expert's "damages theories are not speculative or based on future damages," it nevertheless effectively admitted that the D&P Report is "based on Spotify's *future* projection of Gimlet's revenue."[21]Even if the D&P Report had some relevance to a reasonable royalty calculation here, Prof. Edelman improperly applied it in a vacuum: he embraced the ███ rate *without* any independent analysis of its applicability to a hypothetical negotiation between the parties.

*Reasonable Royalty—The 7.78% Royalty Rate.* Prof. Edelman's third alternative royalty rate of 7.78% is even further untethered from the facts and circumstances of this case, as he blithely copied this rate from an inapposite unreported District of Oregon case, *adidas Am., Inc. v. Payless Shoesource, Inc.*, 2008 WL 4279812 (D. Or. Sept. 12, 2008)—a forward confusion case in which the parties' goods (sneakers) were identical and the 7.78% royalty was "consistent with royalties between adidas or Payless with third parties." *Id.* at *12. Significantly, Plaintiff never even addressed—let alone tried to defend—this purported royalty rate in its summary judgment briefing.

*Plaintiff's Attorney-Driven* ███ *Damages Theory.* In its summary judgment motion, served just four months before the scheduled trial, Plaintiff—for the first time—advanced a novel argument that it is "entitled to at least ███ in damages" as a form of "disgorgement of profits," which, according to Plaintiff, is the amount that Gimlet and Spotify "have documented in accounting records is the minimum value which they ascribe to their infringing Reply All trademark[.]" (Dkt. 156 at 1-2.) In advocating for this ███ figure, Plaintiff discarded its own expert's disgorgement calculation, presumably because it would not yield a big enough windfall. As Gimlet previously explained, however, the ███figure has no basis in fact or law because it is

---

[20] *See* Dkt. 157, Ex. T, Final Duff & Phelps Report (July 9, 2019) at SPOTIFY00334.
[21] Dkt. 158, Pl's Resp. to Def.'s Rule 56.1 Statement ¶ 19.

wholly unrelated to Gimlet's profits. (Dkt. 157 at 34.) It is a present-day valuation of the ████

████████████████████████████████████████████████████████████████████

██████████████████—revenue that is legally speculative as it could be lower, higher, or even

stop for any number of reasons. (Dkt. 157 at 34.) While Plaintiff obtained this number from the

D&P Report, an otherwise irrelevant accounting document,[22] Plaintiff offered no legal support for

its entitlement to recovery of ████ because no such support exists. Even Plaintiff's damages expert

conceded that *there is no case law to support such a finding of future damages*.[23] This damages

"theory" further shows Plaintiff's and its counsel's vexatious motives—the ████ figure must have

been intended to intimidate Gimlet into a windfall settlement.

Gimlet moved *in limine* to exclude this baseless damages theory, since it was not disclosed

during discovery or in the Proposed Joint Pretrial Order. (Dkt. 175 at 13-15.)

*Plaintiff's Attorney-Driven $60M Damages Theory.* Also in its summary judgment

motion, Plaintiff for the first time advanced a remarkable argument that "ReplyAll will present

evidence at trial, including through expert testimony, that the damages are in the range of $60

million." (Dkt. 156 at 2.) This theory, however, was nowhere to be found in (or otherwise

supported by) Prof. Edelman's expert reports.[24] This unsupported theory was based on the

following tortured attorney logic: Spotify acquired Gimlet for $195M; Spotify assigned

approximately $142M of that amount to goodwill (that amount being *separate* from the value

Spotify had assigned to its trademarks); Gimlet's *Reply All* podcast accounted for 42% of Gimlet's

monthly downloads; and, thus, "the actual value of the goodwill of the Infringing Mark is actually

closer to $60 million [i.e., 42% of $142M], as will be proven at trial." (Dkt. 156 at 1-3.) This

damages "theory"—again evidently intended to intimidate Gimlet into an enormous windfall

---

[22] Dkt. 157, Ex. T, Final Duff & Phelps Report (July 9, 2019) at SPOTIFY00385.
[23] Dkt. 157, Ex. AO, 9/20/19 Edelman Tr., at 92:2-8.
[24] *See* Dkt. 92, Ex. 18, 1/13/17 Edelman Rpt.; Dkt. 157, Ex. AL, 8/12/19 Edelman Supp. Rpt.

settlement—was likewise driven by vexatious motives. Indeed, the fact that Plaintiff once offered Gimlet a license for $1.00 per year,[25] and then, on the eve of trial asserted that it was entitled $60M, showcases the grossly unreasonable manner in which Plaintiff litigated.[26]

* * * *

Plaintiff's and its counsel's pursuit of these baseless damages theories—some deemed "fundamentally flawed" by other courts, and others barred by Second Circuit precedent—forced Gimlet to incur sizable attorney fees to defend this action. It should be able to recover those fees.

### 3.    Plaintiff's Continued Unjustified Reliance on Instances of Non-Cognizable "Confusion"

Plaintiff repeatedly asserted that "ample consumer confusion" existed between Plaintiff's and Gimlet's marks. (*E.g.*, Dkt. 92 at 1.) Plaintiff claimed that it "produced dozens of examples of instances of actual confusion … where its own customers have confused the two products." (*Id.* at 3.) As the Court summarized, to show actual confusion, Plaintiff alleged:

> [E]ight misdirected social media posts, three unsolicited emails praising Defendant's podcast from unidentified individuals, two emails from individuals mistaking Plaintiff and Defendant's podcast in conversation . . . , and one inquiry by a 'potential new customer' of Plaintiff into whether Plaintiff was related to Defendant's podcast . . . Plaintiff submitted neither evidence of consumer surveys nor any other evidence of lost sales.

(Dkt. 181 at 11-12.) Plaintiff should have been aware that these instances constitute "scant evidence to support a finding of actual confusion." (*Id.* at 12.) Nonetheless, Plaintiff pressed on, falsely characterizing its evidence as real examples of consumer confusion.

It is well-established in the Second Circuit that evidence of actual confusion must "involve purchasers or prospective purchasers." *Lang v. Ret. Living Publ'g Co.*, 949 F.2d 576, 583 (2d Cir. 1991). Gimlet raised this issue multiple times throughout this litigation, beginning, at least, with its summary judgment motion, served on December 1, 2017. (*See* Dkt. 89 at 31.) Plaintiff's alleged

---

[25] Dkt. 157, Ex. AF; Dkt. 157, Ex. AG, Audio Recording of Parties' Negotiations (Dec. 2, 2014); Dkt. 157, Ex. AH, Certified Tr. of Audio Recording of Parties' Negotiations (Dec. 2, 2014).

[26] Gimlet moved in limine to exclude this baseless damages theory; beyond not making any logical sense, it was not disclosed during discovery or in the Proposed Joint Pretrial Order. (Dkt. 175 at 13-15.)

- 14 -

evidence of actual confusion was nothing more than inquiries as to whether Plaintiff is associated with Gimlet; mis-tagged social media handles and misdirected correspondence; and internet comments posted primarily by Mr. Abramowitz, his personal friends and family, and other undisclosed or unidentified third parties. Despite being put on notice that these purported instances of confusion were irrelevant, Plaintiff continued to make statements such as, "ReplyAll has provided substantial evidence of actual confusion between these two products" and "Plaintiff has shown . . . *many* examples of actual confusion[.]" (*See, e.g.*, Dkt. 92 at 2-3.) Thus, Plaintiff unswervingly relied on arguments that were contrary to basic Second Circuit precedent on numerous occasions.

Plaintiff also made several misrepresentations in conjunction with its actual confusion allegations. Plaintiff claimed that actual confusion between the parties' Twitter handles was "causing ReplyAll to actually lose its consumers to Gimlet." (*Id.* at 28.) Likewise, Plaintiff asserted that actual confusion between the parties marks' had "completely undermined ReplyAll's business development and made it difficult to find investors." (Dkt. 156 at 7.) But, Mr. Abramowitz testified *twice* that he could not name a single customer or investor lost as a result of Gimlet.[27]

Additionally, Plaintiff wrote, "[s]ome examples of actual confusion include, without limitation: [a] January 14, 2015, tweet from a consumer regarding the two marks: 'I'm so confused about [Gimlet's Twitter handle] @replyall and [Plaintiff ReplyAll's Twitter handle] @Replyalldotme. . . Now @replyalldotme is writing about podcasts? Yikes.'" (Dkt. 92 at 13.) This is the same Tweet that Dylan Hulser posted and that Plaintiff repeatedly introduced as an exhibit.[28] Although Plaintiff described Mr. Hulser as a "consumer" in its brief, Mr. Abramowitz conceded

---

[27] Dkt. 89, Ex. L, 9/13/16 Abramowitz Tr., at 36:10-38:18, 206:22-207:12, 286:25-287:4; Ex. 4, 10/20/17 Abramowitz Tr., at 73:19-74:19.

[28] *See* Dkt. 92, Ex. 17, Dylan Hulser Tweet.

that he neither knew nor had a single communication with Mr. Hulser.[29] Plaintiff's briefs thus contained repeated misrepresentations to the Court.

### 4. Plaintiff Raised Baseless Discovery Issues And Did Not Even Utilize The Documents It Pushed For

After Spotify purchased Gimlet, as a concession to Plaintiff, Gimlet agreed to limited discovery regarding the acquisition. Particularly, Spotify and Gimlet would produce documents and information "related to [Spotify's] acquisition of [Gimlet] that relate to or concern a valuation of the Gimlet Reply All podcast or the Reply All mark as used in association with the Gimlet Reply All podcast." (Dkt. 128 at 2.) After Spotify's initial document production and subsequent production of documents that Spotify and Gimlet maintained were irrelevant—but that Plaintiff insisted were "highly relevant" to its damages case—Plaintiff's counsel did not even provide to its damages expert many of the documents Spotify produced.[30] It is the height of hubris—and exceptionality—to fight for documents that it told this Court are "highly relevant" to its damages claims, and then not even show them to its damages expert. *See Eon-Net LP v. Flagstar Bancorp*, 653 F.3d 1314, 1327 (Fed. Cir. 2011) (affirming fee award in part because small plaintiff had an "ability to impose disproportionate discovery costs" on defendant).

### 5. Plaintiff's and Plaintiff's Counsel's Additional Baseless Lawsuits and Claims of Spoliation

In the past few years, the parties have attempted on several occasions to settle this dispute. For instance, after Spotify acquired Gimlet, the parties entered into a mediation.[31] Shortly before, in an obvious attempt to pressure Gimlet, Plaintiff's counsel emailed Gimlet's counsel a draft complaint alleging claims against Gimlet, Spotify, the founders of Gimlet, and the hosts of the

---

[29] Ex. 4, 10/20/17 Abramowitz Tr., at 82:19-24.
[30] Dkt. 158, Ex. 21, 9/20/19 Edelman Tr., at 5:8-6:3.
[31] Strand Decl., ¶¶ 2-5.

*Reply All* podcast.[32] In addition to an unfair competition claim that tracked the trademark claims in this case, Plaintiff added baseless claims of "promissory estoppel" and "unjust enrichment."[33]

This draft complaint was plaintively baseless. And sending it to Gimlet's counsel forced Gimlet to expend time and resources in preparing its defenses should the complaint be filed, as Plaintiff's counsel threatened.[34] Plaintiff's proposed promissory estoppel claim was based on a settlement discussion that took place in 2014, and during which no agreement was reached. In apparent recognition this claim's weakness, Plaintiff later dropped it when it drafted yet another complaint,[35] as discussed below. Drafting such a groundless complaint and using it simply as leverage in negotiations, is exceptional. *Cf. Eon-Net LP*, 653 F.3d at 1327 (affirming fee award in part because of plaintiff's "ability to impose high costs to defend against its meritless claims" where plaintiff faced no repercussions besides sanctions).

Plaintiff's proposed unjust enrichment claims also had no basis whatsoever: it is well-settled in New York that unjust enrichment claims should be dismissed when duplicative of other claims, here, Plaintiff's trademark claims. *Nelson v. MillerCoors*, 246 F. Supp. 3d 666, 679 (E.D.N.Y. 2017); *Sprint Sols. v. iCell Guru*, 2016 WL 3198248, at *4 (E.D.N.Y. June 7, 2016) (holding claim for unjust enrichment duplicative of trademark claim).

When the parties next sat down to discuss settlement, in early-December 2019, Plaintiff's counsel attempted the same routine. This time Plaintiff's counsel handed over the Second Draft Complaint to Gimlet's counsel at the conference. And this time, Plaintiff proposed adding ***17 defendants and 14 new claims***. Moreover, Plaintiff improperly used Gimlet and Spotify confidential information to draft the complaint. During a hearing before Magistrate Judge Kuo to resolve the impropriety of using such confidential information for a new complaint, the Magistrate

---

[32] Strand Decl., ¶ 5.
[33] Ex. 1, Draft Complaint, Reply All Corp. v. Spotify USA Inc. (N.Y. Sup. Ct. May 17, 2019) (unfiled).
[34] Strand Decl., ¶ 7.
[35] Dkt. 169, Ex. A.

Judge quickly disposed of Plaintiff's argument, ruling in Gimlet's favor and finding there was "no ambiguity" in the Protective Order. (Dkt. 177 at 10:20-22.)

Through a letter writing campaign and its Second Draft Complaint, Plaintiff's counsel also repeatedly threatened Gimlet's and Spotify's counsel—and employees at Spotify and a non-party valuation firm, Duff & Phelps—with baseless allegations of "spoliation" and "fraud." Plaintiff began this campaign shortly after the depositions of Spotify's witnesses. On July 23, 2019, Plaintiff's counsel wrote to Gimlet's counsel alleging that "Spotify committed spoliation by materially altering" a post-acquisition valuation report.[36] Plaintiff's counsel also attempted to involve undersigned counsel in the alleged "spoliation," stating the change was made at "the behest of litigation counsel."[37] In truth, as Spotify's Chief Accounting Officer later explained in a declaration to the Court,[38] Spotify simply requested that its valuation firm change one label in the post-acquisition report to conform to everyone's understanding of the information. And that change *did not change the valuation firm's opinion* as to the "Fair Value of Reply All Trade Name / Trademarks."[39] Plaintiff was made aware of the change, was provided with all the relevant documents, and was permitted to broadly question Mr. Sawyer on this issue. (*See* Dkt. 179 at 2.)

The parties' counsel then had a series of calls to try to resolve the issue, during which Gimlet's counsel requested any case law that supported Plaintiff's counsel's allegations.[40] Even with ample opportunity to do so, Plaintiff never provided any such case law. After the issue sat dormant for several months, Gimlet's counsel believed the issue to be dead. But instead of raising the issue as a discovery matter with Magistrate Judge Kuo during discovery, Plaintiff's counsel

---

[36] Ex. 3, 7/23/19 Letter from Balestriere to Strand, at 9.

[37] *Id.* at 10.

[38] Dkt. 157-4, Sawyer Decl., at ¶ 11.

[39] *Id.*

[40] Ex. 5, 8/13/19 Letter from Strand to Balestriere ("We have now requested at least twice for Plaintiff to provide any case law to support its baseless and vexatious allegations of spoliation against Spotify. Plaintiff has produced no such case law, because no such law exists.").

choose to sit on the issue until only a few weeks before trial, when it asked permission to file a new complaint based on confidential information. Magistrate Judge Kuo, denying Plaintiff's motion to allow Plaintiff to skirt the protective order to file the complaint, noted that Plaintiff's efforts to bring the new complaint were having the exact effect Plaintiff and its counsel may have been seeking—distracting Gimlet's counsel from trial preparations. (Dkt. 177 at 18:25-19:12 ("You're a month away from trial, okay, and I really don't want the parties to be putting their effort into this issue in this case. … It doesn't seem fair or a good use of everybody's energies, which is limited—we're all human beings—to have this issue a few weeks before trial. It's not good.").)

Plaintiff's and its counsel's baseless claims of spoliation, fraud, and unjust enrichment, in letters and draft complaints, make this case exceptional. Plaintiff and its counsel neatly avoided ever having their baseless allegations tested, by simply not raising such issues with this Court until the eve of trial, when it would potentially have the most effect in delaying Plaintiff's reckoning.

### 6.    Summary Judgment Granted in Gimlet's Favor

To end the litigation, on February 12, the Court granted Gimlet's summary judgment motion on liability. After walking through the controlling *Polaroid* factors, the Court concluded that "there is no likelihood of confusion." (Dkt. 181.) In so concluding, the Court found each of the *Polaroid* factors tipped in Gimlet's favor, or at best for Plaintiff, was neutral, thus showing the baselessness of Plaintiff's claims. Gimlet does not repeat the Court's conclusions for each factor, but focuses on the ones where Plaintiff and its counsel repeatedly overstated Plaintiff's case.

***Strength of Mark.*** The Court concluded that "Plaintiff's lack of sales, marketing expenditures, and general absence from the marketplace demonstrate a lack of commercial strength." (Dkt. 181 at 7 (citations omitted).) Indeed, during a large percentage of this case, Plaintiff failed to maintain itself as a corporation.[41] Notably, the Court also concluded that "the term 'reply all' is a term in common use and is readily recognized by anyone who uses email."

---

[41] Dkt. 157, Ex. AC; Dkt. 157, Ex. AD.

Mr. Abramowitz, incredibly, denied as much during his deposition. Taking such an illogical position surely "stands out" from other cases:

> Q. Were the arrows used in the Reply All Corp. logo inspired by the double arrows used in reply all in connection with e-mail? [objection]
>
> A. No.
>
> Q. So are you saying that you independently selected a double arrow logo to use in connection with ReplyAll?
>
> A. Yes.[42]

***Competitive Proximity.*** The Court concluded that "[t]there is significant competitive distance between Plaintiff's software and the production and monetization of Defendant's podcast business." (Dkt. 181 at 10.) Yet, Plaintiff argued repeatedly—and without any factual basis—that "[t]he structure of Gimlet's Reply All podcast is highly similar to ReplyAll's conversations, ***the only difference*** being that consumers read ReplyAll's conversations while consumers can read or listen to Gimlet's conversations." (Dkt. 92 at 1.)

***Actual Confusion.*** Plaintiff unfailingly alleged that it had provided "***substantial evidence*** of actual confusion" between Plaintiff's software product and Gimlet's *Reply All* podcast (*id.* at 2), and that it "shall present ***further evidence*** [of actual confusion] at trial as it continues to develop to this very day." (Dkt. 158 at 14.) But when the Court analyzed the evidence, it rightly concluded "there is scant evidence to support a finding of actual confusion." (Dkt. 181 at 12.)

***Bad Faith.*** Plaintiff also repeatedly claimed that "[t]he evidence here shows that Gimlet acted willfully and in bad faith in its [alleged] infringement." (Dkt. 92 at 3.) Plaintiff went so far as to claim that Gimlet's President Mr. Lieber "***flat out lied***" to the Trademark Office in his trademark application declaration. (Dkt. 156 at 7.) But these allegations were demonstrably untrue, and the Court did not find this a close question. The Court found instead that there "is no evidence Defendant selected the Reply All mark in bad faith." (Dkt. 181 at 13-14 (finding that "Defendant's

---

[42] Dkt. 89, Ex. L, 9/13/16 Abramowitz Tr., at 324:12-20.

actions in engaging in negotiations, seeking the advice of counsel, and successfully registering its mark with the UPSTO are strong indicia of good faith on the part of the Defendant.")

These strong conclusions, among others, demonstrate how this case "stands out" from the typical trademark case.

### 7.      Plaintiff's Pretrial

In the weeks leading up to trial, Plaintiff and its counsel further demonstrated their unreasonable conduct by blatantly violating this Court's Orders and Individual Rules. For example, per the Court's June 13, 2019 Amended Scheduling Order (based on the parties' Stipulation (Dkt. 128)), the parties were required to "exchange draft joint pre-trial orders, including *statements concerning damages and other relief for each claim*, … on or before January 13, 2020." (Dkt. 128 at 2-3.) The Court's Individual Rules provided further information regarding the required contents of the draft joint pre-trial order, including, for example, "[a] *detailed statement regarding damages* and other relief sought for each claim."[43]

On the deadline, however, Plaintiff provided *no* statement at all regarding damages—let alone the required "detailed statement regarding damages and other relief sought for each claim."[44] Gimlet, by contrast, spent significant effort to satisfy the Court's Orders and Individual Rules.[45]

Notwithstanding having nearly *two weeks* to remedy this gross violation of the Court's Orders and Individual Rules, Plaintiff *never* provided the required statement of damages and other relief sought—indeed, that section, and other Plaintiff sections, remained *blank* in the Proposed Joint Pretrial Order filed on January 24, 2020. (Dkt. 174 at 15.) Particularly regarding damages, where Plaintiff offered numerous disparate disgorgement and reasonable royalty theories, which

---

[43] Individual Mot. Practices and Rules of Judge William F. Kuntz, II at 7.

[44] Ex. 6, Plaintiff's Draft Proposed Joint Pretrial Order, served Jan. 13, 2020.

[45] Ex. 7, Gimlet's Draft Proposed Joint Pretrial Order, served Jan. 13, 2020.

ranged from just over $1 million to $60 million, Plaintiff's refusal to provide a clear statement regarding damages prior to trial is especially egregious.

* * * *

These facts show what has been true to Gimlet's counsel since this case began: Plaintiff's case was baseless. And Plaintiff and its counsel litigated the case in such a manner as to take what should have been a simple trademark case, and multiply the proceedings in such a manner that Gimlet was forced to incur over $1M in attorneys' fees pursuing needless discovery and defending Plaintiff's shifting sands damages theories. This case is "exceptional" and Gimlet respectfully requests the Court award it its fees under 15 U.S.C. § 1117.

## II.    Plaintiff's Current Attorneys Unreasonably and Vexatiously Multiplied These Proceedings, Justifying an Award of Fees and Expenses to Gimlet

Here, Plaintiff's current counsel is to blame, and should be subject to sanctions, for vexatiously multiplying these proceedings in at least two significant respects (1) maintaining numerous non-cognizable damages claims that Gimlet had to incur substantial expenses defending, and (2) threatening two completely baseless lawsuits, and asserting baseless allegations of spoliation and fraud, in an attempt to drive up Plaintiff's settlement demands.[46]

### A.    Legal Standard for Attorneys' Fees Under 28 U.S.C. § 1927

Title 28 U.S.C. § 1927 provides for the award of a party's attorneys' fees, costs, and expenses against opposing counsel when that counsel "multiplies the proceedings in any case unreasonably and vexatiously." The award of such fees requires "the attorney's actions [be] so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay." *U.S. v. Int'l Bhd. of Teamsters*, 948 F.2d 1338, 1345 (2d Cir. 1991) (internal citations omitted).

---

[46] This is not the first time Plaintiff's attorneys have been subject to sanctions motions. *See Ray v. Balestriere Fariello LLP*, No. 18-CV-11211-KPF, Slip Op. (Oct. 16, 2019 S.D.N.Y), Dkt. 37 and *Lawson v. Rubin*, No. 17-CV-6404-BMC, Slip Op. (Oct. 5, 2018), Dkt. 189.

**B.      Plaintiff's Counsel Should Be Sanctioned for Maintaining Multiple Baseless Damages Claims**

As discussed above, Plaintiff and its counsel maintained multiple baseless damages claims—even while failing to offer any proof of lost sales, actual harm, or any other damage.

Indeed, by these disparate, and even contradictory, theories—with no basis in law or fact—Plaintiff's counsel vexatiously multiplied these proceedings, and Gimlet was forced to defend against each one by, for example: hiring its own damages expert to rebut these baseless theories;[47] filing two summary judgment motions regarding damages (*see* Dkt. 89 *et seq.*; Dkt. 157 *et seq.*); opposing Plaintiff's frivolous motion for summary judgment as to ███ in damages as a form of "disgorgement of profits" (Dkt. 157 at 34-35); filing a *Daubert* motion to preclude the testimony of Plaintiff's expert relating to his reasonable royalty opinions (Dkt. 157 at 29-33); and filing a motion in limine to exclude damages contentions, and related evidence, not disclosed during discovery or in the Proposed Pretrial Order. (Dkt. 175 at 13-15.)

As explained above, to prevail on its damages claims, Plaintiff had to show not only that Gimlet infringed Plaintiff's mark, but also that Gimlet acted deceptively or in bad faith in doing so, and that Plaintiff had sustained pecuniary loss as a result of the infringement. Beyond the fact that there was never any evidence that Gimlet selected the Reply All mark in bad faith, as confirmed by the Court (*see* Dkt. 181 at 13-14), that Mr. Abramowitz twice testified that he could not name a single investor or customer Plaintiff lost as a result of Gimlet's use of the name REPLY ALL. That should have ended the damages inquiry full stop. But Plaintiff and its counsel nevertheless forged ahead with their legally impermissible theories in a transparent—and bad faith—effort to extract a windfall settlement, as discussed more fully above.

This course of conduct reveals that the litigation was undertaken not because Plaintiff believed it had viable claims for relief, but rather to "use litigation as a profit center." *PaySys Int'l,*

---

[47] *See, e.g.*, Dkt. 95, Ex. WW, 3/15/17 Weir Rpt.; Ex. 8, 9/13/19 Weir Rpt.

*Inc. v. Atos Se*, 2019 WL 2051812, at *10 (S.D.N.Y. May 9, 2019) (finding that plaintiff's claims "lacked merit" and that its "chosen litigation strategy was a bad faith attempt to extract a settlement through punishing legal costs"). The record makes clear that Plaintiff's counsel had no reason to resort to litigation at all, let alone pursue Plaintiff's baseless damages theories, other than as a reckless effort to extract a windfall from Gimlet in the face of Plaintiff's total "lack of sales, marketing expenditures, and general absence from the marketplace." (Dkt. 181 at 7.)

### C.  Plaintiff's Counsel Should Be Sanctioned for Making Baseless Accusations and Threatening Baseless Lawsuits

A consistent theme echoed throughout this litigation, especially after Spotify purchased Gimlet: Plaintiff's counsel would make baseless allegations, either in letters or draft complaints, and then choose not to pursue those allegations—until raising the issue would potentially cause the most pressure and prejudice on Gimlet and its counsel. *See* Sections I.B.3 and I.B.5. Such threatening actions unnecessarily multiplied these proceedings because Gimlet's counsel needed to expend substantial efforts preparing responses and defenses to Plaintiff's accusations, even if the underlying claims were baseless. *Cf. Coleman v. Oasis Outsourcing, Inc.*, 779 F. App'x 649, 653 (11th Cir. 2019) (affirming award of sanctions where plaintiff refused to drop claim later subject to successful motion to dismiss); *Eon-Net LP*, 653 F.3d at 1327 (affirming fee award in part because of smaller plaintiff's "ability to impose high costs to defend against its meritless claims" where non-practicing plaintiff faced no repercussions besides sanctions).

Each time Plaintiff raised these issues, Gimlet's counsel had to expend enormous resources in preparing to counter them. When Plaintiff's counsel first provided it a draft complaint for New York State Court, Gimlet was forced to research the law that showed the complaint had no basis, and to work with the individuals named in the complaint in anticipation of it being filed. Then when Plaintiff's counsel alleged—without any citation to relevant case law—that Spotify in conjunction with the undersigned counsel had committed spoliation, Gimlet's counsel had to

research the issue and assure those involved that nothing untoward had happened, because, in fact, nothing untoward did happen.[48] Then, Plaintiff's counsel never raised this phony "spoliation" issue with the Magistrate Judge for resolution. *Mohammed v. Delta Air Lines*, 2011 WL 5553827, *4 (E.D.N.Y. Jun. 8, 2011) ("plaintiff may not employ independent causes of action based on the alleged [spoliation] violations"). Instead, Plaintiff's counsel waited until shortly before trial to drop the Second Draft Complaint in opposing counsel's lap during a settlement conference. As a result, Gimlet's counsel, instead of dedicating all of its time to trial prep, had to contact the ***17 defendants*** Plaintiff's counsel proposed suing, and again, assure them that there was no wrongdoing. Plaintiff's counsel surely should have known that there was no spoliation, at the least from Mr. Sawyer's detailed declaration that explained the baseless nature of Plaintiff's new claims. Plaintiff not once addressed, let alone rebutted, Mr. Sawyer's testimony on this matter. The only conclusion that can be drawn is that Plaintiff's counsel knew the baselessness of its claims, but still choose to pursue them for leverage in settlement. Even if these events did not upset the proceedings before the Court, in that the Court entered summary judgment, sanctions are still proper. *Enmon v. Prospect Capital Corp.*, 675 F.3d 138, 145 (2d Cir. 2012) ("sanctions may be warranted even where bad-faith conduct does not disrupt the litigation before the sanctioning court").

## <u>CONCLUSION</u>

For the foregoing reasons, Gimlet respectfully requests the Court award it its attorneys' fees pursuant to 15 U.S.C. § 1117, 28 U.S.C. § 1927, and the Court's inherent powers, including those fees incurred in preparing this motion. Pursuant to § 1927, Gimlet requests this award, including expenses, be made at least in part against Plaintiff's current counsel, Balestriere Fariello. *See* Section II. A fair estimate of Gimlet's recoverable fees is $1.4M, though should the Court award Gimlet its fees and expenses, Gimlet would welcome the opportunity to brief the reasonableness and amount of its fees.

---

[48] *See* Dkt. 157, Sawyer Decl. at ¶ 11; Strand Decl., ¶ 7.

Respectfully submitted,

WOLF, GREENFIELD & SACKS, P.C.

Dated:  March 13, 2020

   */s/ John L. Strand*
John L. Strand (admitted pro hac vice)
Bryan S. Conley (admitted pro hac vice)
Amanda B. Slade (admitted pro hac vice)
600 Atlantic Avenue
Boston, MA 02210
Telephone: (617) 646-8000
john.strand@wolfgreenfield.com
bryan.conley@wolfgreenfield.com
amanda.slade@wolfgreenfield.com

*Attorneys for Defendant Gimlet, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on March 13, 2020, I caused to be served Gimlet's Motion for Attorneys' Fees and all related papers on counsel for Plaintiff.

*/s/ John L. Strand*